UNITED STATES ex rel. MAINE POTATO GROWERS & SHIPPERS ASS'N et al. v. INTERSTATE COMMERCE COMMISSION et al. *

No. 6690.

United States Court of Appeals for the District of Columbia.

Argued Oct. 7, 1936.

Decided Jan. 4, 1937.

*Writ of certiorari denied 57 S.Ct. 754, 81 L.Ed. —.

Frederick E. Brown, Wilbur La Roe, Jr., and Arthur L. Winn, Jr., all of Washington, D. C., for appellants.

Joseph T. Sherier, J. Stanley Payne, and G. F. Snyder, all of Washington, D. C., for appellees.

Before ROBB, VAN ORSDEL, GRONER, and STEPHENS, JJ.

GRONER, J.

This is a mandamus proceeding. The appellants are an association of Maine potato growers and shippers and two of their distributors, one located at Norfolk and the other at Savannah. Respondent Bangor & Aroostook is a short line railroad extending from the northern part of Maine to Searsport on the Maine coast and to Northern Maine Junction in the interior, where it connects with the Maine Central Railroad. It is essentially a potato road just as the Virginian Railway is a coal road. Aroostook county, through which the railroad extends, produces practically 40 per cent. of the total potato tonnage shipped in the United States, and prior to the season 1931–32 all the potato traffic of the respondent Bangor Railroad moved from the potato fields on the northern end of its line to Maine Junction, where it was delivered to the Central road for further rail transportation. In October, 1931, a new development occurred in the forwarding of potato shipments from Aroostook county. There were then many ocean vessels idle, and the shippers were able to secure low rates on potato shipments by water from Searsport terminal to New York, Philadelphia, Baltimore, and points as far south as New Orleans, and Houston, Tex. A large percentage of the total shipments of potatoes was distributed under this new arrangement by rail and water carriage. But in June of 1932, effective August, 1932, the rail rates to Searsport were increased proportionately from 25 per cent. to 39 per cent. The rail carriage to Searsport exceeded that to Maine Junction by about 18 miles.

In August, 1932, appellant potato growers association filed with the Commission a complaint against the railroad, and in November Philips and Budreau, distributors, intervened. The complaints were docketed as Nos. 25511 and 25679, and were heard together. The growers' complaint alleged that the new rates were unjust and unreasonable in violation of section 1 of the Interstate Commerce Act (49 U.S.C.A. § 1). The complaint prayed for a cease and desist order and for the establishment of just and reasonable rates and for reparation. The complaint of Philips and Budreau alleged that the increase was discriminatory because it applied only to potatoes shipped to Searsport and not potatoes moving over other routes and because the new rates were unreasonably high when compared with other rates maintained by the railroads on other New England lines of similar transportation

service.[1] The railroad denied that the rates were unreasonable and prayed for a dismissal of the complaints. A large amount of testimony was given and voluminous documentary evidence was introduced on behalf of the complainants, respondent, and interveners. Briefs were filed, and in July, 1933, Division 3 of the Commission handed down its report, in which the rates and practices complained of were found not to be unreasonable and unjust and the complaints were dismissed. In September, 1933, appellants petitioned for reconsideration before the full Commission. The Commission granted a rehearing, and oral argument was had, and in September, 1934, the Commission handed down its report (consisting of eight printed pages of the record) affirming the former report of Division 3, holding that the complained-of rates were not unreasonable. A subsequent petition for rehearing was denied in February, 1935, and in March, 1935, the present action was commenced in the District Court by the filing of a petition for a writ of mandamus against the Commission. The Commission answered the rule to show cause, and there was a reply to the answer and a rejoinder to the reply. The entire record before the examiner and the Commission was introduced, and witnesses were produced. At the conclusion of the hearings the District Court denied the writ and dismissed the petition. A subsequent motion to vacate the judgment and to re-enter it upon findings of fact and conclusions of law was overruled.[2]

The record is full of evidence which is denied, qualified, or explained away by both sides. But in the view we take of the case the question for decision is not so much the weight or the adequacy of the evidence as it is the more vital question whether the Commission has discharged the mandatory and ministerial duty imposed upon it by statute.

Section 1 (5) of the act (U.S.Code, title 49, c. 1, §§ 1–6, 12, 13, 15 [49 U.S. C.A. §§ 1–6, 12, 13, 15], Transp.Act 1920, 41 Stat. 474–488) requires all rates to be just and reasonable and makes unjust and unreasonable rates unlawful. Section 12 imposes on the Commission the positive duty of enforcing the act. Sections 13 and 15 provide for hearings upon petitions charging violations of the act, and empower the Commission, after hearings, to prescribe reasonable rates. Section 15a (2), as amended June 16, 1933, 48 Stat. 220, 49 U.S.C.A. § 15a (2), provides: "In the exercise of its power to prescribe just and reasonable rates the Commission shall give due consideration, among other factors, to the effect of rates on the movement of traffic; to the need, in the public interest, of adequate and efficient railway transportation service at the lowest cost consistent with the furnishing of such service; and to the need of revenues sufficient to enable the carriers, under honest, economical, and efficient management, to provide such service."

Putting aside all questions of relative importance of the various elements of rate-making—because the controlling facts in each case necessarily vary—there can be no doubt that in prescribing reasonable rates the Commission is required to take into consideration, *among other factors,* first, the effect of the rate on the movement of traffic; second, public need of adequate low-cost service; third, the carrier's need of sufficient revenue to enable it to give such service. This, as we think, is the clear mandate of the statute. But the weight to be given to these several factors is left to the discretion of the Commission, as is also the weight to be given the other and unnamed factors which of necessity vary in substance according to the facts.

If the problem were otherwise and if the duty of this court were to reweigh the evidence, much might be said in support of the proposition that there was ample evidence to sustain appellants' position that the new rates were unnecessary to enable the railway to operate at a profit—for it shows that under the old rates the railroad was unusually prosperous and even in the depression period paid regular dividends on its common stock, and under the terms of the recapture law (now repealed) was liable to surrender a large accumulated surplus.

There was also persuasive evidence that the right of the public to low-cost service was adversely affected by the increase, and

---

[1] There were also charges of discrimination against Searsport and a charge of unreasonable demurrage charges, etc., at that port—but these points were not pressed in the argument.

[2] It would have been better practice if the District Court had made findings of facts. That practice is always desirable and in some instances absolutely essential.

equally persuasive evidence that the new rates had injuriously affected the movement of potatoes. And in this view—if we were sitting as a court of errors—it might well be that enough appears to justify reversal. But, as we shall presently point out, this is not the case, for the rule in mandamus is wholly different. The Commission, in disposing of the questions we have mentioned, held, first, that the new rates to Searsport, coupled with the low water rates from that port, are not at such a level as to interfere materially with the movement of Maine potatoes in competition with potatoes from other sections of the United States; second, that the increased rates were not unreasonable or otherwise unlawful, nor could it be so held because of depressed economic conditions in the Maine potato industry; and, third, that the aggregate revenues of the carrier from all traffic could not be considered as a determining factor in the reduction of a particular rate otherwise fair and reasonable. And, in reaching these conclusions, the Commission might very well under permissible provisions of the act have considered a number of factors shown in the evidence or given greater weight to particular factors—for instance, the necessities of connecting carriers or other like matters about which we can only guess. And this brings us to the determining factor so far as we are concerned—the question whether, in deciding as it did, the Commission violated or refused in some way to discharge a duty required by the act.

Considered in its plain terms, this duty seems to be to give due consideration to those named and unnamed factors which affect the propriety and reasonableness of the rate. In the present case there is no contention that the Commission declined to take jurisdiction or to exercise that jurisdiction or that it failed or refused to decide all the issues raised by the pleadings. The point of divergence arises out of the contention that the Commission failed to give proper weight to the three factors particularly mentioned in the act, or more specifically, failed to consider the showing of lack of necessity for increased revenue to the carrier. In other words, that the Commission failed to follow the standard set up in the act by which its decision should be controlled.

The mandate of the act, 15a (2), is that the Commission shall give "due con-

sideration." To give due consideration to a particular factor necessarily means to give such weight or significance to it as under the circumstances it seems to merit, and this, of course, involves discretion; and, as has been said many times, judicial discretion. And, as also has been many times said, to review this judicial discretion on a petition for mandamus is beyond our jurisdiction. United States ex rel. Cripple Creek Co. v. I. C. C., 56 App.D.C. 168, 11 F.(2d) 554. And so it follows that, though we may strongly feel that the new rates established by the carrier were unreasonable either in their effect on the movement of traffic, or on the furnishing of economical service to the public, or in view of the carrier's lack of need of increased revenue and that we would ourselves have decided the complaint differently, we nevertheless feel that it is now too well established to admit of doubt, that we cannot consider these questions; for mandamus reaches only the question whether the duty as it exists was discharged and not the soundness or the justice of the result.

The cases of I. C. C. v. U. S. ex rel. Humboldt S. S. Co., 224 U.S. 474, 32 S.Ct. 556, 56 L.Ed. 849; U. S. ex rel. Louisville Cement Co. v. I. C. C., 246 U.S. 638, 38 S. Ct. 408, 64 L.Ed. 914; and U. S. ex rel. Kansas City Southern R. Co. v. I. C. C., 252 U.S. 178, 40 S.Ct. 187, 64 L.Ed. 517, are wholly different from the case at hand. In the first, the Commission refused to take jurisdiction on the theory that Alaska was not a territory within the meaning of the act, and because of this the Supreme Court held that mandamus was proper. In the second, the Commission refused to take jurisdiction on the ground that the claim was barred by limitations, and mandamus was held proper because of this erroneous disavowal of jurisdiction. In the third, the Commission refused to hear evidence as to valuation on the basis of the "present cost of condemnation," etc., on the ground that it was "rationally impossible" to determine that question, and the Supreme Court held that mandamus was proper to require the Commission to carry out a plain duty imposed by Congress.

But in I. C. Commission v. Waste Merchants, 260 U.S. 32, 43 S.Ct. 6, 67 L. Ed. 112; U. S. ex rel. St. Louis S. W. R. Co. v. I. C. Commission, 264 U.S. 64, 44 S. Ct. 294, 68 L.Ed. 565; Interstate Commerce Comm. v. N. Y., N. H. & H. R. Co.,

287 U.S. 178, 53 S.Ct. 106, 77 L.Ed. 248; I. C. C. v. U. S. ex rel. Campbell, 289 U.S. 385, 53 S.Ct. 607, 611, 77 L.Ed. 1273; and Chicago Great Western R. Co. v. Commission, 294 U.S. 50, 55 S.Ct. 326, 79 L.Ed. 752—all cases which went from this court to the Supreme Court—it was held that errors of law in the discharge of a function essentially judicial are not subject to be corrected through the writ of mandamus any more than errors of fact. In all these cases and in many others the Supreme Court has confined the functions of mandamus within narrow and technical limits, and it is not open to us to extend them. Here, as we have seen, the Commission heard the complaints and made its decision; and in these circumstances, as was said by the Supreme Court in I. C. C. v. U. S. ex rel. Campbell, supra: "If the mandamus were to stand, the result would not be to compel the Commission to adjudicate the cause, for that it has already done; the result would be to compel an adjudication in a particular way. The rule is elementary that this is not the function of the writ. Mandamus is an appropriate remedy to compel a judicial officer to act. It may not be used as a substitute for an appeal or writ of error to dictate the manner of his action."

■ In the circumstances, however erroneous we may think the conclusion reached by the Commission or however strongly we may feel that we might have reached a different one, the decision of the Commission is beyond our power to correct on this petition.

■ Second. Appellants complain of the refusal of the Commission to grant a reopening and rehearing. Appellants rely upon A., T. & Santa Fe Railway Co. v. United States, 284 U.S. 248, 52 S.Ct. 146, 76 L.Ed. 273. In that case a rehearing was asked for based on widespread changes in economic conditions occurring since the close of the hearing—the changed condition was the general industrial depression beginning the latter part of 1929. The Supreme Court described it as a different economic era. Appellants say that through a rehearing they hope to enlighten the Commission on the effect of the increased rates on the movement of traffic, that is to say, that as the result of these new rates the shipment of thousands of carloads of potatoes had been prevented. They further say that the investigation made by the Commission and the evidence which was introduced before the Commission covered only a single season under the new rates and that, if rehearing is granted, the results for the subsequent season can be shown and these would sustain their position that the rates seriously affect the movement of traffic. The Commission insists the case of the Santa Fe Railroad and the case of this railroad are wholly different. In the former the record before the Commission was closed in 1928 and the order of the Commission was entered in 1931, and between the taking of the evidence and final decision of the case the depression intervened. Here the petition for rehearing was filed within two months after the Commission's reconsideration and report, and the petition sets up as ground for rehearing nothing more than the fact that the second season's experience with the new rates furnishes definite evidence of conditions predicted in the first hearing and considered by the Commission. In the Santa Fe Case the Supreme Court held that rehearing should have been granted because of overruling economic forces inducing a changed economic level, but in the later case of U. S. v. Northern Pacific Railway, 288 U.S. 490, 53 S.Ct. 406, 77 L.Ed. 914, the Supreme Court sustained the Commission's refusal to grant rehearing and said that the decision in the Santa Fe Case should not be extended to require a rehearing in every rate case for changed economic conditions.

We have examined the evidence in this case in the light of the petition for rehearing, and find nothing there except the fact that some nine thousand fewer cars of potatoes traveled by the Searsport route in the 1933–34 season than in the 1931–32 season and that during this period the all-rail rate to New York, Philadelphia, and Boston was reduced 4 cents per hundred pounds. All that is claimed is consistent with the fact that the Maine potato shippers were using the all-rail route at the lesser rate. But certainly, as we think, there is nothing in the Santa Fe Case which will justify our saying that the Commission abused its discretion when, on petition filed within two months of its decision, it declined to reopen the hearing.

Affirmed.