495 F.2d 1010
 161 U.S.App.D.C. 430
 AMERICAN AIRLINES, INC., et al., Petitioners,
v.
CIVIL AERONAUTICS BOARD, Respondent, Texas International
Airlines, Inc., et al., Intervenors.
UNITED AIR LINES, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent, Texas International
Airlines, Inc., et al., Intervenors.
TRANS WORLD AIRLINES, INC., Petitioner.
v.
CIVIL AERONAUTICS BOARD, Respondent, Frontier Airlines,
Inc., et al., Intervenors.
 Nos. 72-1741, 72-1743, 72-1744.
 United States Court of Appeals, District of Columbia Circuit.
 Decided March 29, 1974.
 
 J. William Doolittle, Washington, D.C., with whom Alfred V. J. Prather, Washington, D.C., was on the brief, for petitioners in No. 72-1741.
 Henry L. Hill, Chicago, Ill., with whom H. Templeton Brown, Chicago, Ill., was on the brief, for petitioner in No. 72-1743.
 Edmund E. Harvey, Washington, D.C., for petitioner in No. 72-1744.
 Glen M. Bendixsen, Atty., Civil Aeronautics Bd., for respondent. R. Tenney Johnson, Gen. Counsel, Civil Aeronautics Bd., O. D. Ozment, Deputy Gen. Counsel, Warren L. Sharfman, Associate Gen. Counsel, Litigation and Research, at the time the brief was filed, Robert L. Toomey, Asst. Associate Gen. Counsel, Litigation and Research, Ivars V. Mellups and Alan R. Demby, Attys., Civil Aeronautics Bd., and Howard E. Shapiro, Atty., Dept. of Justice, were on the brief for respondent.
 
 
 1
 William C. Burt, Washington, D.C., for intervenors Frontier Airlines, Inc., Hughes Airwest, Piedmont Aviation, Inc., and Texas International Airlines, Inc.
 
 
 2
 Richard P. Taylor, Washington, D.C., was on the brief for intervenors Brown County, Wisconsin and The Green Bay Chamber of Commerce in Nos. 72-1743 and 72-1744.
 
 
 3
 George B. Schwahn was on the brief for intervenor State of Wisconsin in Nos. 72-1743 and 72-1744. George F. Sieker, Madison, Wis., also entered an appearance for intervenor State of Wisconsin.
 
 
 4
 Raymond J. Rasenberger and James L. Devall, Washington, D.C., entered appearances for intervenors North Central Airlines, Inc. and Ozark Air Lines, Inc.
 
 
 5
 Before WRIGHT, ROBINSON and MacKINNON, Circuit Judges.
 
 J. SKELLY WRIGHT, Circuit Judge:
 
 6
 Petitioners challenge two orders[1] of the Civil Aeronautics Board entered in Phase 4 of the Board's Domestic Passenger Fare Investigation.
 
 
 7
 The Investigation is a comprehensive and continuing examination of fare levels, fare structures, and fare-setting methodology throughout the airline industry.[2] Phase 4 deals with the fares charged passengers traveling to their destinations by means of two or more different airlines. Typically, but not invariably, such 'interline' journeys involve a long segment flown by a 'trunkline' carrier-- i.e., a national airline such as petitioners-- and a short segment flown by a local service carrier operating only in a regional market. (Representatives of the local service carriers, and of their passengers, have intervened here in support of the Board's orders.) The customary fare for an interline flight has been the sum of the fares charged to local passengers for each of the flight's two or more segments. In some markets, however, this 'sum-of-the-locals' fare was supplanted by agreement between the participating carriers to levy a 'joint fare'-- a single price for the interline flight which is less than the sum-of-the-locals. These agreements traditionally divided joint fare revenues between participating carriers by the 'rate pro-rate' method, whereby the ratio of the carriers' revenue shares equaled the ratio of the local fares charged to non-interline passengers for each segment of the flight.
 
 
 8
 In Phase 4 the Board set out for the first time to determine on a nationwide basis which interline routes should have joint fares, what these fares should be, and how joint fare revenue should be divided. By the instant orders, the Board has decided (1) that every interline route should have a joint fare of no more than the sum-of-the-locals minus $4 per terminal connection involved,[3] and (2) that joint fare revenues should be divided on a 'cost pro-rate' basis, whereby a carrier's percentage share would equal that carrier's percentage share of the total costs incurred in providing the interline flight.[4] All petitioners join in contesting these two decisions on a variety of grounds.
 
 
 9
 For the reasons set out below, we affirm both of the Board's decisions. In so doing, however, we take note that Phase 4 continues and that our affirmance extends only to the actions presently before us. Though the new joint fare ceilings-- $4 below the sum-of-the-locals-- are now in effect, the Board has stated its intention to reconsider joint fare levels after the conclusion of Phase 9 of the Fare Investigation;[5] today we of course imply no view on the legal or factual issues which may confront the Board at that time. Also, the Board has stayed implementation of the cost prorate method of dividing joint fare revenues until Phase 9 develops more sophisticated cost data with which to construct a divisions formula.[6] While we affirm here the Board's completed decision to adopt the principle of dividing revenues according to relative costs, we venture no opinion on the separate legal and empirical problems which may be raised by measurement of those costs and actual application of the principle.[7]
 
 I. THE PROCEEDINGS BELOW
 
 10
 Regulation of joint fares and joint fare divisions operates within very simple statutory guidelines. Section 404(a) of the Federal Aviation Act (49 U.S.C. 1301 et seq. (1970)) creates in 'every air carrier' a duty to 'establish, observe, and enforce just and reasonable individual and joint rates, fares, and charges, * * * and, in case of such joint rates, fares, and charges, to establish just, reasonable, and equitable divisions thereof as between air carriers * * * which shall not unduly prefer or prejudice any of such participating air carriers.' 49 U.S.C. 1374(a). Section 404(b) prohibits carriers from subjecting 'any particular person, port, locality, or description of traffic in air transportation to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever.' 49 U.S.C. 1374(b).
 
 
 11
 At its own initiative, the Board 'shall determine and prescribe the lawful rate, fare, or charge (or the maximum or minimum, or the maximum and minimum thereof)' if 'after notice and hearing' it is 'of the opinion that any individual or joint rate, fare, or charge * * * is or will be unjust or unreasonable, or unjustly discriminatory, or unduly preferential, or unduly prejudicial * * *.' Section 1002(d) of the Act, 49 U.S.C. 1482(d). In evaluating and prescribing fares, the Board must 'take into consideration' certain factors listed in the Act's 'Rule of rate making,' Section 1002(e), 49 U.S.C. 1482(e). Finally, if it is 'of the opinion that the divisions of joint rates, fares, or charges * * * are or will be unjust, unreasonable, inequitable, or unduly preferential or prejudicial * * *, the Board shall prescribe the just, reasonable, and equitable divisions thereof * * *.' Section 1002(h) of the Act, 49 U.S.C. 1482(h).
 
 
 12
 In its first 35 years, however, the Board used its powers to prescribe fares and revenue divisions for interline routes very sparingly.[8] These matters were left largely to the discretion of the airlines. As a consequence of this hands-off policy, the availability of joint fares was quite limited and, where such fares existed, the revenues were almost always divided by the rate pro-rate method. These consequences were resented by the local service airlines and by passengers forced to rely on these airlines to begin or terminate their journeys at out-of-the-way airports served infrequently or not at all by the trunk airlines.
 
 
 13
 The availability of joint fares depended largely on whether the interline route in question was also served by frequent single-carrier flights. Single-carrier service over a segmented route is typically priced well below the sum-of-the-locals fare; indeed, such service is often priced identically with that carrier's non-stop flights over the route. When single-carrier competition was absent, carriers participating on an interline route usually charged a sum-of-the-locals fare; only where single-carrier competition had developed did the interline carriers establish joint fares substantially below the sum-of-the-locals. Many interline passengers thought this pattern capricious.
 
 
 14
 In their turn, the local service airlines disliked the traditional rate pro-rate method of dividing joint fare revenues. It is an axiom of airline economics-- now under examination in Phase 9 of the Fare Investigation-- that fares do not accurately mirror airline costs. Permile costs tend to decrease or 'taper' as the non-stop length of a flight increases, for take-offs and terminal servicing are extraordinarily costly. But present per-mile fares do not fully reflect this tapering: To allow and encourage short distance travelers to use the airlines, fares for short flights are often set below cost, while fares on long flights are set to generate high profits. For the trunk carriers, having flights of various lengths, the long hauls 'internally subsidize' the short hauls. The local service carriers, by contrast, specialize in short flights and often operate at an overall deficit. The federal government covers these deficits through a 'mail subsidy,' authorized under Section 406(b) of the Act, 49 U.S.C. 1376(b), by paying for the mail carrying services of local service carriers at rates well above the costs of such services to the carriers. Because, on most interline flights, a trunkline carrier flies the long segment and a local service carrier the short segment, the rate pro-rate method of dividing revenue awarded the trunk carrier more revenue relative to costs than it did the local service carrier. The local service carriers thought this practice unreasonable. It enlarged their overall deficits, and thus their mail subsidies, with the alleged result that these subsidies were going in part toward the inequitable enrichment of the trunk carriers.
 
 
 15
 In 1969 the Board decided that the availability, levels, and divisions of joint fares should no longer be left to the discretion of the airlines. In August 1969 the Board authorized all domestic carriers to discuss joint fares for 90 days.[9] In September 1969 this authorization was enlarged to encompass division of joint fare revenues, with the Board urging 'a division which is more closely oriented toward actual costs of the respective carriers involved * * *.'[10] At the same time the Board announced that passenger fare revisions filed by the airlines after February 1, 1970 would be approved only if the airlines made progress toward resolving joint fare issues.[11] Faced with this ultimatum, the airlines came forward with two proposed joint fare agreements in January 1970.
 
 
 16
 The first agreement, championed in the main by the trunk carriers, was rejected by the Board.[12] The second proposal, the so-called Mohawk Agreement, was advocated chiefly by the local service carriers, and the Board approved it as 'an acceptable interim solution.'[13] Under the agreement, joint fares were established in markets without competing single-carrier service in which 200 or more passengers per quarter had flown in 1968. As in the rejected agreement, joint fares were set at the sum-of-the-locals for the dominant routing in the market minus $4 per terminal connection. Where the short-haul fare was $35 or less, each carrier received $9, with the balance divided on a rate prorate formula; where the short-haul fare exceeded $35, a straight rate pro-rate formula was applied. The trunk carriers joined the Mohawk Agreement after the Board suspended their passenger fares generally and made such acquiescence the price for approval of new fares.[14]
 
 
 17
 There promptly ensued the comprehensive examination of joint fare issues which became Phase 4 of the Fare Investigation. After a prehearing conference, the Board's hearing examiner decided to exclude as a Phase 4 matter the reasonableness of prevailing local fares, for this question was set for detailed study in Phase 7.[15] Phase 4 was, however, to consider among other matters the proper relationship between joint fares and the sum-of-the-locals fares customarily charged for interline travel.[16] After extended and public evidentiary hearings, the examiner announced his findings in an exhaustive decision filed December 16, 1970.[17] Reviewing these findings sua sponte, on the basis of briefs and oral argument, the Board issued the first of its challenged orders, accompanied by a long opinion, on April 10, 1972. The Board's order on reconsideration, accompanied by a supplemental opinion, was entered June 6, 1972.
 
 
 18
 The Level of Interline Fares: The examiner declared the prevailing interline fares offered on routes without frequent single-carrier competition to be unlawful for two reasons. First, he found that these fares discriminated against the passengers paying them because passengers using single-carrier service on these routes, and passengers using interline routes where serious single-carrier competition existed, paid lower fares. The examiner believed that this difference in fares could not be explained by any difference in the 'value' of the services offered, and that it was consequently discriminatory.[18] Second, he found that prevailing interline fares were 'unjust and unreasonable' because irrationally related to the costs of providing interline travel.[19] Interline fares were typically higher than single-carrier fares for identically segmented flights over identical routes, but-- the examiner found-- virtually identical costs were incurred on the two kinds of service. In addition, the sum-of-the-locals fare customarily charged for interline travel was based on the mistaken premise that the cost of flying an interline passenger equaled the sum of the cost of flying a different local passenger on each segment of the interline route. In fact, the examiner concluded, the costs incurred on an interline flight were approximately $4 cheaper per terminal connection than the sum-of-the-locals costs, because an interline passenger needs only a single reservation, a single ticket, and one session of baggage-taking.[20]
 
 
 19
 To remedy these several defects, the examiner devised a complex formula for computing the lawful joint fare to be used on those interline routes where there weas little or no single-carrier competition.[21] In its first order on review, the Board decided to defer considering the proper relationship between interline fares and single-carrier fares until the conclusion of Phase 9.[22] Thus the Board necessarily put to one side both the examiner's conclusion that prevailing interline fares were discriminatory and the examiner's finding that interline flights involve costs equal to those of identically segmented singlecarrier flights. But the Board expressly adopted the examiner's finding that interline costs are $4 less per terminal connection than the sum-of-the-locals costs.[23] Agreeing that sum-of-the-locals fares are 'unjust and unreasonable' because irrationally related to the costs of flying passengers interline, the Board ordered that no interline fare exceed the sum-of-the-locals minus $4 per terminal connection. The order was applied to all interline routes, because the reasoning behind the $4 differential was valid for every route.[24] In its order on reconsideration the Board reaffirmed this decision, and the new joint fares are now in effect.
 
 
 20
 Joint Fare Divisions: The examiner found the prevailing rate pro-rate method of dividing joint fare revenue to be 'unjust, unreasonable, inequitable, unduly preferential and unduly prejudicial.'[25] Reasoning that a lawful division method must reflect the relative costs incurred by the participating carriers, he found that local fares did not accurately reflect these costs.[26] To accomplish the division of revenue according to relative costs, the examiner adopted a cost pro-rate formula using cost figures supplied by the Board's Bureau of Economics. The formula consisted of 'mileage blocks' which estimated the per-mile costs for flight segments of various lengths. The estimates were based on 'industry average' data and thus on the assumption that the per-mile costs of interline travel were, for any given non-stop distance, the same as the per-mile costs of passenger service generally.[27]
 
 
 21
 The Board likewise found the rate pro-rate method illegal and ordered adoption of the cost pro-rate method. In its first order, the Board defended the use of industry average costs in constructing a cost pro-rate formula,[28] but the order on reconsideration stayed construction and implementation of the cost pro-rate formula pending development of new cost estimates and costing methodologies in Phase 9.[29] The Board reserved the power to make the implementation retroactive but decreed that in the interim joint fare revenues would be divided according to the complicated formula set out in the Mohawk Agreement. Because Phase 9 is not yet complete, the Mohawk division method remains in force at this writing.
 
 II. THE ISSUES
 A. The Level of Interline Fares
 
 22
 Having found that the cost of flying a passenger interline is $4 less per terminal connection than the total costs of flying a separate local passenger on each segment of the interline flight, the Board in effect ordered the airlines to pass this $4 saving through to interline passengers. On this order petitioners mount a relatively narrow attack. They do not dispute that substantial, if conflicting, evidence supports the Board's finding of a $4 cost differential. Nor do they deny that Section 1002(d) empowers the Board to prescribe maximum joint fares if existing interline fares are 'unjust or unreasonable.'[30] But petitioners contend that the Board was powerless to conclude that interline fares failing to reflect the $4 cost saving were for that reason alone unjust or unreasonable. This contention rests on two distinct arguments. First, petitioners argue that the Act's rule of rate-making, Section 1002(e), requires the Board to consider factors other than cost in setting fares. Second, petitioners argue that, by leaving the reasonableness of local fares to examination in Phase 7, the Board deprived itself of the statutory power to declare in Phase 4 that sum-of-the-locals fares are unlawful or that a $4 reduction in such fares renders them lawful. We consider these two arguments in turn.
 
 1. The Rule of Rate Making Argument
 There is no doubt that
 
 23
 a court must decide whether, in determining rates, the Board has properly * * * taken into account the factors which Congress has said should be considered when rates are made.
 
 
 24
 Moss v. CAB, 139 U.S.App.D.C. 150, 159, 430 F.2d 891, 900 (1970). But the rule of rate-making.
 
 
 25
 does not require a complete, time-consuming, scholarly and theoretical review of all aspects of rate-making before the Board passes upon proposals which are submitted.
 
 
 26
 Id., 139 U.S.App.D.C. at 160, 430 F.2d at 901. The proper weight to be accorded to ratemaking factors inevitably varies from case to case and typically turns on matters peculiarly within the expertise of the rate-making agency. Baltimore & Ohio R. Co. v. United States, 345 U.S. 146, 150, 73 S.Ct. 592, 97 L.Ed. 912 (1953); United States ex rel. Maine Potato Growers & Shippers Assn v. ICC, 66 App.D.C. 398, 88 F.2d 780, cert. denied, 300 U.S. 684, 57 S.Ct. 754, 81 L.Ed. 886 (1937). In administrative law generally, statutory lists of decisionmaking factors rarely constitute
 
 
 27
 a set of self-executing principles that inevitably point the way to a clear result in each case. On the contrary, those principles may overlap and may conflict, and where this occurs, resolution is the task of the agency that is expert in the field.
 
 
 28
 Schaffer Transportation Co. v. United States, 355 U.S. 83, 92, 78 S.Ct. 173, 179, 2 L.Ed.2d 117 (1957). Consequently, as we have observed in a relevantly similar context,
 
 
 29
 once the Board has fixed upon a central consideration which it regards as conclusive, it need not deal in detail with every other aspect of the matter.
 
 
 30
 Frontier Airlines, Inc. v. CAB, 142 U.S.App.D.C. 124, 127 n.4, 439 F.2d 634, 637 n.4 (1971). See also Outagamie County, Wisconsin v. CAB, 7 Cir., 355 F.2d 900, 906 (1966).
 
 
 31
 With this background, we turn to the record in this case. The Board's chief rationale for reducing interline fares by $4-- the $4 cost saving incident to interline travel-- accords precisely with the rule of rate-making mandate to consider
 
 
 32
 the need in the public interest of adequate and efficient transportation of persons and property by air carriers at the lowest cost consistent with the furnishing of such service.
 
 
 33
 Section 1002(e)(2). Of the many factors properly considered in setting rates, cost of service is in most instances the most important, J. Bonbright, Principles of Public Utility Rates 67 (1960), and has frequently predominated in many areas of regulation. See, e.g., Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); Chicago & N.W.R. Co. v. Atchison, Topeka & Santa Fe R. Co., 387 U.S. 326, 87 S.Ct. 1585, 18 L.Ed.2d 803 (1967); Capital Group Student Fares, 26 CAB 451 (1958); Group Excursion Fares Investigation, 25 CAB 41 (1957). The Board is not required to deviate from the cost principle absent countervailing considerations recognized by statute. While accurately observing that airline fares often diverge from costs, petitioners have been unable to demonstrate a reason of statutory dimension for depriving interline passengers of the cost savings incident to interline travel. Thus this case gave the Board no occasion to carve out yet another exception to the cost principle.
 
 
 34
 Nevertheless, the Board did not neglect to take into account other considerations set out in the rule of rate-making. Thus, as mandated by Section 1002(e)(1), the Board weighed the effect of its $4 reduction order on the 'movement of traffic' over interline routes, concluding that interline business would be considerbly stimulated.[31] While petitioners suggest that the Board may have overestimated the increase in traffic, they do not press this contention; in any event, this is an area of predictive judgment in which we would be disinclined to intervene. Frontier Airlines, Inc. v. CAB, supra, 142 U.S.App.D.C. at 131, 439 F.2d at 651.
 
 
 35
 The Board also considered the carriers' 'need * * * for revenue,' as mandated by Section 1002(e)(5), concluding that revenue losses occasioned by the $4 reduction in interline fares could be adequately compensated by the coincident increase in interline traffic coupled with local fare adjustments to be made in Phase 7.[32] These adjustments were subsequently effected by Phase 7 orders from which no party sought judicial review. By expressly transferring the issue to a separate proceeding, then in progress, the Board in Phase 4 adequately met its statutory obligation to 'take into consideration' the carriers' revenue needs.[33]
 
 2. The 'Local Fares' Argument
 
 36
 The old sum-of-the-locals fares rested upon the mistaken assumption that the cost of flying an interline passenger was equal to, rather than $4 per terminal connection less than, the sum of the costs of flying a local passenger on each segment of the flight. While the Board remedied this error by reducing interline fares by $4, petitioners point out that an equally logical remedy was to keep interline fares constant and raise local fares by a total of $4; indeed, any number of up or down adjustments in interline and local fares would have done the trick, so long as the required $4 differential was created. But, argue petitioners, the only correct adjustments would be those resulting in reasonable levels for both interline and local fares. These correct adjustments could not be ascertained without examining the reasonableness of existing local fare levels. Because the Board committed that examination to Phase 7, petitioners insist, the Board could not logically conclude in Phase 4 either that existing interline fares were too high (as opposed to local fares being too low) or that a $4 reduction would render these fares reasonable. Petitioners contend that, under Section 1002(d), the former conclusion was a 'jurisdictional' prerequisite to voiding the old interline fares, and the latter conclusion a similar prerequisite to prescribing the new joint fares.
 
 
 37
 This is an ingenious line of argument, but it misconceives the Board's orders and blinks the realities of administrative practice. The instant orders did not fix joint fares at a particular dollar level. The Board's decision is quite clear:
 
 
 38
 The maximum level of joint fares is the sum of each carrier's local fare for the segment it performs minus $4 for each intercarrier connection.[34]
 
 
 39
 The order leaves maximum joint fares perfectly free to fluctuate with alterations in the level of local fares. The same order declared:
 
 
 40
 The fare level as determined in Phase 7 of this proceeding should reflect the effects of this decision.[35]
 
 
 41
 On the same day, the Board in Phase 7 found that existing local fares were unreasonably low, and a subsequent Phase 7 order has substantially raised the ceiling on local fares;[36] the joint fare ceiling established in Phase 4 has risen as an immediate and automatic consequence. Thus in no sense did the Phase 4 orders freeze into joint fares the transient defects which may have plagued local fare levels when the orders were entered.
 
 
 42
 That the reasonableness of a rate may turn in part on its relationship to other rates is a principle which has 'long been settled.' United States v. Northern Pacific R. Co., 288 U.S. 490, 500, 53 S.Ct. 406, 77 L.Ed. 914 (1933). See also Alabama Great Southern R. Co. v. United States, 340 U.S. 216, 71 S.Ct. 264, 95 L.Ed. 225 (1951); Chicago Board of Trade v. United States, 96 U.S.App.D.C. 56, 223 F.2d 348 (1955); Northern Pacific R. Co. v. United States, D.Minn., 41 F.Supp. 439 (1941), affirmed,316 U.S. 346, 62 S.Ct. 1166, 86 L.Ed. 1521 (1942).
 
 
 43
 Thus, it has been held that differences in rates are justified where they are predicated upon differences in facts-- costs of service or otherwise * * *.
 
 
 44
 St. Michaels Utilities Com'n v. FPC, 4 Cir., 377 F.2d 912, 915 (1967). The only novel question here is whether the Board may consider the relationship or differential between rates in one proceeding (Phase 4) while leaving consideration of the absolute levels of the rates to a separate proceeding (Phase 7) coordinated, and running simultaneously, with the first. We perceive no reason why it may not.
 
 
 45
 Petitioners rely heavily on two Interstate Commerce Commission cases which suggest that an inter-carrier fare may be reasonable even if one of the local fares making it up is not. D. E. Ryan Co. v. Great Northern R. Co., 172 ICC 201, 204 (1931), and Wright Lumber Co., Inc. v. Ann Arbor R. Co., 112 ICC 337, 339 (1926). These cases have, of course, little precedential weight in a court proceeding concerned with the actions of a different administrative agency. In any event, we do not think the cases apposite. They merely state the obvious: that a sum depends on all the elements composing it, so that a defect in one element may be offset by an opposite defect in another. The question here is whether an administrative agency may consider the various possible defects in separate, coordinated proceedings. This is a problem in administrative law, not in elementary logic.
 
 
 46
 At issue is the Board's power to segregate its proceedings and group issues in a convenient and efficient manner. Seen this way, the question admits of only one answer. The courts have uniformly recognized the Board's authority to arrange its business and order its dockets as expedience may dictate. Overseas National Airways, Inc. v. CAB, 2 Cir., 426 F.2d 725 (1970); National Airlines, Inc. v. CAB, 129 U.S.App.D.C. 180, 392 F.2d 504 (1968); City of San Antonio v. CAB, 126 U.S.App.D.C. 112, 374 F.2d 326 (1967); Frontier Airlines, Inc. v. CAB, 10 Cir., 349 F.2d 587 (1965); Western Air Lines, Inc. v. CAB, 9 Cir., 184 F.2d 545 (1950). See also Environmental Defense Fund, Inc. v. Hardin, 138 U.S.App.D.C. 391, 397, 428 F.2d 1093, 1099 (1970); Kessler v. FCC, 117 U.S.App.D.C. 130, 141 n.10, 326 F.2d 673, 684 n.10 (1963). In the present case the Board divided its labors in an eminently sensible fashion. The relationship between interline and local fares emerged naturally during the consideration in Phase 4 of all the novel questions raised by joint fares; the issue of local fare levels was sensibly consigned to Phase 7 because it involved problems far more familiar to the Board. As anticipated by the Board, the workings of the two phases meshed with each other to produce mutually consistent results. We would create a nightmarish precedent by requiring merger of Phases 4 and 7 merely because the joint fare ceiling in Phase 4 was formulated in terms of the local fare levels under study in Phase 7. Every fare in a well-articulated rate structure is related in some more or less formal fashion to every other fare. For the Board to decide all fare issues at once, in a single and ungainly proceeding, is manifestly absurd.
 
 
 47
 The wording of Section 1002(d) provides no support for petitioners' views. The Board is authorized to void any unlawful 'joint rate, fare, or charge * * * or any classification, rule, regulation, or practice affecting such rate, fare, or charge * * *.' Upon doing so, the Board may 'determine and prescribe the lawful rate, fare, or charge (or the maximum or minimum, or the maximum and minimum thereof) * * * or the lawful classification, rule, regulation, or practice thereafter to be made effective.' The congressional palette has rarely felt a broader brush. And in assessing the Board's statutory powers, we cannot ignore the fact that the Phase 4 orders made express reference to the imminent action in Phase 7 which promised to, and apparently did, meet the highly technical objections raised here by petitioners. When the Board's actions obviously contemplate future administrative modification and supplementation, its authority is unusually expansive. Moss v. CAB, supra, 139 U.S.App.D.C. at 160-161, 430 F.2d at 901-902; National Air Carrier Assn v. CAB, 141 U.S.App.D.C. 31, 40, 436 F.2d 185, 194 (1970). We therefore hold that Section 1002(d) empowers the Board to prescribe lawful differentials between fares, at least so long as the legality of the resultant fare levels is set for prompt examination in a related proceeding.
 
 B. The Division of Interline Fares[37]
 
 48
 Under the cost pro-rate method of dividing joint fare revenue, which the instant orders adopt as a governing principle, a carrier's percentage share of the revenue is set equal to that carrier's percentage share of the total costs incurred in providing the interline flight. Since costs closely approximate the resources, labor and time contributed, the cost pro-rate method has the virtue of matching relative rewards to relative sacrifice. It is also evenhanded and neutral as between the long- and short-haul carriers, for the ratio of revenue to costs is the same for each on any given interline flight.
 
 
 49
 Nonetheless, petitioners argue vigorously that the method is not 'just, reasonable, and equitable,' as Section 1002(h) requires. In short, they claim that the method 'subsidizes' the short-haul carrier at the expense of the long-haul carrier, and that the Board lacks the statutory power to force such a result. The term subsidy nowhere appears in the Federal Aviation Act and has acquired no fixed meaning in administrative law. Petitioners are not making the facile claim that the cost pro-rate formula is a 'subsidy' merely because it increases the short-haul carrier's share over that provided by the old rate prorate system; petitioners concede, as they must, that the Act does not embalm the old rate pro-rate formula as the only lawful one.[38] Rather, petitioners' subsidy argument proceeds along a somewhat sinuous path. They first take not that, in the present passenger rate structure, fares for short flights are often set below cost; this results in a deficit for local service airlines which the federal government covers by means of mail 'subsidy.' Next, petitioners point out, and the Board concedes, that a cost prorate formula would at times grant to the short-haul carrier on an interline flight a revenue share in excess of the 'local fare'-- the fare charged by the carrier to non-interline passengers on the flight segment in question; this phenomenon also follows directly from the sub-cost nature of many local fares for short distance flights. From these premises petitioners conclude-- and this is their crucial proposition-- that a joint revenue share 'subsidizes' the deficit experienced by the short-haul carrier, in serving local passengers, to the extent that the revenue share exceeds the local fare.
 
 
 50
 Petitioners contend the Board lacks the statutory power to effect such a subsidy through apportionment of joint fare revenue. They acknowledge that Section 1002(h) makes no reference to local fares being a ceiling on lawful shares of joint revenue. The provision merely requires that revenue divisions be 'just, reasonable, and equitable' and the Act's legislative history contains no explication of the phrase. But petitioners suggest that their position is supported by the overall structure of the Act and by a careful comparison of the Act with various provisions of the Interstate Commerce Act.
 
 
 51
 The proposed statutory exegesis is quite involved, and we restrict ourselves to its high points. In fixing rates for mail transportation, the Board is mandated by Section 406(b) of the Federal Aviation Act to 'take into consideration'
 
 
 52
 (3) the need of each such air carrier * * * for compensation for the transportation of mail sufficient to insure the performance of such service, and, together with all other revenue of the air carrier, to enable such air carrier under honest, economical, and efficient management, to maintain and continue the development of air transportation to the extent and of the character and quality required for the commerce of the United States, the Postal Service, and the national defense.
 
 
 53
 49 U.S.C. 1376(b)(3). This language clearly authorizes the Board to set mail rates above cost to subsidize financially weak airlines in the public interest,[39] and petitioners reason that the absence in Section 1002(h) of any like reference to revenue requirements indicates that a like power of subsidy does not exist when the Board is determining joint revenue divisions.
 
 
 54
 To buttress this view petitioners observe that, in authorizing the ICC to apportion joint railroad rate revenue in a 'just, reasonable, and equitable' fashion, the Interstate Commerce Act expressly mandates the Commission to consider
 
 
 55
 the amount of revenue required to pay their (the participating carriers') respective operating expenses, taxes, and a fair return on their railway property held for and used in the service of transportation, and the importance to the public of the transportation services of such carriers * * * and any other fact or circumstance which would ordinarily, without regard to the mileage haul, entitle one carrier to a greater or less proportion than another carrier of the joint rate, fare, or charge.
 
 
 56
 Section 15(6) of the Act, 49 U.S.C. 15(6) (1970). This language was added by the Transportation Act of 1920, 41 Stat. 456, 486, in part to make clear the Commission's power to use joint rate divisions as a vehicle for subsidizing financially weak railroads with the high profits generated on other roads.[40] See United States v. Great Northern R. Co., 343 U.S. 562, 569, 72 S.Ct. 985, 96 L.Ed. 1142 (1952); United States v. Abilene & Southern R. Co., 265 U.S. 274, 284, 44 S.Ct. 565, 68 L.Ed. 1016 (1924); New England Divisions Case, 261 U.S. 184, 189-191, 43 S.Ct. 270, 67 L.Ed. 605 (1923). Fifteen years later, Congress enacted the Federal Aviation Act without inserting any mention of 'revenue required' in the provision of apportionment of joint fare revenue. In petitioners' view, this failure cannot be ascribed to oversight, for five years later, in 1940, Congress again used subsidy-like language in enacting Section 307(e) of the Interstate Commerce Act, 54 Stat. 898, 938, 49 U.S.C. 907(e) (1970), which concerns division of joint water carrier rates.[41]
 
 
 57
 Whatever their merits, petitioners' arguments are, we believe, largely irrelevant to the issue raised by the CAB's adoption of the cost pro-rate formula. In particular, we find it unnecessary to decide whether the Board's power to apportion joint fares differs from that of the ICC to apportion joint rail and water carrier rates. The Board's authority to consider the revenue needs of financially weak carriers would be at issue only if the Board had exercised that power in the instant orders. It has not done so. A cost pro-rate formula divides interline revenues according to the relative operating costs incurred on the interline flight. Neither in purpose nor in effect does such a formula 'subsidize' the deficit created by sub-cost local fares for service provided to non-interline passengers. That a joint revenue share exceeds the local fare does not mean that any part of that share is available to subsidize local service. Such subsidization would be possible only if the joint revenue share exceeded the carrier's costs (plus a reasonable profit) on interline service.
 
 
 58
 Petitioners make no claim that a cost pro-rate formula would grant such excess profits on interline service to short-haul carriers; nor do they contend that the long-haul shares would be unreasonably related to long-haul costs. Even if made and sustained, neither claim would indicate that the long-haul carriers were subsidizing the short-haul carriers. Under the cost pro-rate formula, the revenue-to-cost ratio is by definition identical for all carriers on an interline flight; if one enjoys excess profits or suffers unreasonable losses, so do all. Petitioners' subsidy argument wrongly assumes that some minimum share of the joint revenue 'belongs' to the long-haul carrier. Joint revenues belong to no carrier until apportioned through a lawful formula. Chicago & N.W.R. Co. v. Atchison, Topeka & Santa Fe R. Co., supra, 387 U.S. at 362, 87 S.Ct. 1585; New England Divisions Case, supra,261 U.S. at 195, 43 S.Ct. 270. Of course, an apportionment may be inequitable if one carrier is unduly favored, but Section 1002(h) nowhere indicates that equity is to turn on the relationship between a carrier's revenue share and the local fare it charges to non-interline passengers.[42]
 
 
 59
 The several statutory provisions cited to us by petitioners have no bearing on this case. Statutory language recognizing revenue needs is not necessary to support a revenue share equal to or less than the carrier's absolute or relative costs (including a reasonable profit) for that service; considerations of revenue need are relevant only when the revenue share for one service is designed to provide a net-of-cost surplus for meeting losses or requirements developed on other services.
 
 
 60
 This distinction between service-specific costs and overall revenue needs as a basis for joint fare divisions is deeply entrenched in the law. See, e.g., Baltimore & Ohio R. Co. v. Aberdeen & Rockfish R. Co., 393 U.S. 87, 94, 89 S.Ct. 280, 21 L.Ed.2d 219 (1968); Chicago & N.W.R. Co. v. Atchison, Topeka & Santa Fe R. Co., supra, 387 U.S. at 344, 360, 87 S.Ct. 1585; Hamilton, Divisions of Joint Rail Freight Rates Under the Interstate Commerce Act, 37 ICC Prac.J. 378, 393, 395, 399-400 (1970). Thus the mail pay provision of the Federal Aviation Act, Section 406(b), on which petitioners rely, provides a 'subsidy' precisely because it establishes above-cost mail rates to cover financial needs developed on nonmail services.
 
 
 61
 The 'need' on the carrier is measured by the entirety of its operations, not by the losses of one division or department. * * * The wording of the Act precludes measuring 'the need' of the carrier by any other unit than the carrier as an entity.
 
 
 62
 * * * Congress has established a special formula for the fixing of a subsidy rate. While the rate may be for a class of service, the return in form of a subsidy must be computed with reference to the entire operations of the carrier. The requirement is that the Board offset all of a carrier's revenues in determining the subsidy(.)
 
 
 63
 Delta Airlines, Inc. v. Summerfield, 347 U.S. 74, 79, 74 S.Ct. 350, 353, 98 L.Ed. 513 (1954). See also Western Air Lines, Inc. v. CAB, 347 U.S. 67, 74 S.Ct. 347, 98 L.Ed. 508 (1954). Similarly, Section 15(6) of the Interstate Commerce Act was designed to authorize joint rate divisions in excess of the absolute or relative costs of inter-carrier service to cover carrier deficits incurred on other services or on capital account. See United States v. Abilene & Southern R. Co., supra, 265 U.S. at 284, 44 S.Ct. 565. Long before enactment of Section 15(6), when railroad rate divisions had to meet only a 'just and reasonable' standard, the ICC had ample authority to base divisions on the relative costs incurred in inter-carrier service. See, e.g., Low Moor Iron Co. of Va v. Chesapeake & Ohio R. Co., 42 ICC 221, 227 (1916); Class Rates From Chestnut Ridge Railway Stations, 41 ICC 62, 67 (1916); Louisville Board of Trade v. Indianapolis, Columbus & Southern Traction Co., 34 ICC 640, 642 (1915); Investigation of Alleged Unreasonable Rates on Meats, 23 ICC 656, 661-662 (1912); Star Grain & Lumber Co. v. Atchison, Topeka & Santa Fe R. Co., 14 ICC 364, 370 (1908). Without any doubt, the CAB-- operating under a mandate to establish 'just, reasonable, and equitable' divisions-- has this same authority.
 
 C. The Measurement of Costs
 
 64
 Before using the cost pro-rate principle to apportion joint fare revenues, the Board must of course estimate the relative costs incurred in operating flight segments of various lengths. The Board, in its order on reconsideration, deferred making any such estimates pending an examination in Phase 9 of the many theoretical and practical problems involved in identifying, classifying and measuring airline costs generally.[43] Petitioners contend, however, that the instant order effectively adopt the 'industry average' method of constructing a cost pro-rate formula, and that the present Phase 4 record does not support use of this method. Disagreeing with the first contention, we need not reach the second.
 
 
 65
 Under the 'industry average' method the costs of carrying an interline passenger over a flight segment of a given distance are computed by averaging the costs incurred by all scheduled airlines in flying both interline and non-interline passengers over that distance. The method has the advantage of convenience, for separate data on the costs of flying interline passengers are not readily available, and-- given that many flights carry both interline and local passengers-- such separate data may be very difficult to gather. Petitioners argue that, for a variety of reasons, interline costs may vary considerably from non-interline costs; the Board doubts these speculations. Petitioners argue that the Board failed to meet its burden to produce substantial evidence showing that the 'industry average' method is reliable; the Board's counsel replies that the evidentiary burden was on petitioners to show the method to be unreliable.
 
 
 66
 These questions are premature, and we decline to address the legality of the 'industry average' method or to specify what if any evidentiary showing is necessary to sustain or preclude its use. While the Board did discuss the method with approval in its first decision, we do not construe the Board's orders as adopting the method. All of the legal problems, both substantive and procedural, raised by actual construction of a cost pro-rate formula have been temporarily mooted by the Board's decision to defer that construction to the conclusion of Phase 9. See TCO Industries, Inc. v. CAB, 5 Cir., 432 F.2d 1355 (1970); compare Goodman v. Public Service Com'n, 151 U.S.App.D.C. 321, 467 F.2d 375 (1972). The Board's sentiments favoring the 'industry average' method do not constitute a final order adopting the method. At any rate, we do not think a court can intelligently assess the virtues and defects of that method unless and until the agency actually uses it to construct a working cost pro-rate formula. See Toilet Goods Assn, Inc. v. Gardner, 387 U.S. 158, 164, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); Abbott Laboratories v. Gardner, 387 U.S. 136, 148-149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).
 
 
 67
 The Board's orders, as construed above, are
 
 
 68
 Affirmed.
 
 
 
 [1]
 Order 72-4-42 (April 10, 1972) capitioned 'Interim Final Opinion' (hereinafter 'First Order'), and Order 72-6-29 (June 6, 1972) captioned 'Supplemental Opinion and Order on Reconsideration' (hereinafter 'Second Order')
 
 
 [2]
 The Phases of the Investigation are segregated by subject matter. As outlined in the order establishing the Investigation, Order 70-2-121 (Feb. 26, 1970), the Phases are:
 
 
 [1]
 Aircraft Depreciation
 
 
 [2]
 Leased Aircraft
 
 
 [3]
 Deferred Federal Income Taxes
 
 
 [4]
 Joint Fares
 
 
 [5]
 Discount Fares
 
 
 [6]
 Load Factor and Seating Configurations
 
 
 [7]
 Fare Level
 
 
 [8]
 Rate of Return
 
 
 [9]
 Fare Structure
 All of the Phases except 4 and 9 are complete, although Phase 7 is subject to modification in light of developments in Phases 4 and 7.
 
 
 [3]
 First Order, Findings 1, 2 & 5, pp. 43-44. The new ceiling was applied to 'each basic class of service (i.e., first, coach, and regional, jet custom or standard) which is offered by each carrier participating in the interline carriage.' Id., Finding 3, p. 43. The order applied the ceiling to 'children's-fare traffic, but not for other types of discount traffic.' Id., Finding 4, p. 43. The Second Order did not disturb any of these decisions
 
 
 [4]
 First Order, Findings 7 & 8, p. 44
 
 
 [5]
 Id., Finding 6, p. 44
 
 
 [6]
 Id., Finding 9, p. 44, as amended by Second Order, pp. 19-20
 
 
 [7]
 See Part II-C of this opinion infra
 
 
 [8]
 The Federal Aviation Act was enacted in 1958, 72 Stat. 737, 49 U.S.C. 1301 et seq. (1970). The discussion in text relies chiefly on the Initial Decision of the Phase 4 Hearing Examiner, Dec. 16, 1970 (hereinafter 'Examiner's Decision'), pp. 3-7, 21-32
 
 
 [9]
 Order 69-8-85 (Aug. 15, 1969)
 
 
 [10]
 Order 69-9-68 (Sept. 12, 1969) at 10
 
 
 [11]
 Id. at 11
 
 
 [12]
 Order 70-1-148 (Jan. 30, 1970) at 6. The agreement provided for joint fares in those markets without single-carrier service in which 360 passengers per quarter had traveled in 1968. The fares would have equaled the sum-of-the-locals fare for the dominant routing in each market less $4 per terminal connection. The short-haul carrier would have received its local fare, and the long-haul carrier the remainder, unless the short-haul carrier's local fare exceeded $23; in the latter case, both carriers would have received $9 with the balance of the revenues divided according to the line haul-- as opposed to airport or terminal charge-- portion of the local fares involved
 
 
 [13]
 Order 70-1-148 (Jan. 30, 1970) at 6
 
 
 [14]
 Id. at 7 & 8
 
 
 [15]
 Report of Prehearing Conference (April 1, 1970) at 6
 
 
 [16]
 Id. at 2
 
 
 [17]
 See note 8 supra
 
 
 [18]
 Examiner's Decision at 23-30
 
 
 [19]
 Id. at 30-32
 
 
 [20]
 Id. at 32, 40-41
 
 
 [21]
 The joint fare created by the examiner had two components: a terminal charge to reflect airport costs and a line-haul charge to reflect in-flight costs. (Many local fare formulas have these two components.) The line-haul charge was to depend solely on the total length of the interline flight. A segmented flight involves higher costs than a non-stop flight of equal total distance, chiefly because take-offs are peculiarly costly; but the examiner ignored this fact in figuring the line-haul charge because he wished to end the 'discrimination' between interline and single-carrier fares, and single carriers typically charge an identical fare for a segmented and a nonstop flight over the same route. The terminal charge in the new joint fare was to be the sum of the local terminal charges minus the $4 per terminal connection which was saved by the one-step reservation, ticketing and handling service provided to interline passengers. Examiner's Decision at 40-45
 
 
 [22]
 First Order, Finding 6, p. 44
 
 
 [23]
 Id. at pp 15-19
 
 
 [24]
 Id. at p. 22
 
 
 [25]
 Examiner's Decision at 72
 
 
 [26]
 Id. at 57
 
 
 [27]
 Id. at 69
 
 
 [28]
 Id. at 37-39
 
 
 [29]
 See Part II-C of this opinion infra
 
 
 [30]
 Petitioners emphasize that the Board's power to prescribe rates and divisions depends on a prior finding that existing rates and divisions are unlawful. The Board does not apparently dispute this reading of 1002(d) & 1002(h) of the Aviation Act, a reading supported by Hawaiian Common Fares Case, 37 CAB 269 (1962)
 
 
 [31]
 First Order at pp. 40-41; Second Order at pp. 8-15
 
 
 [32]
 Ibid
 
 
 [33]
 The Board also attempted to sustain its ruling by discussing the 'value of service' of interline travel. First Order at p. 15. The Board contended that interline service had less 'value' to passengers than single-carrier service because the interline passenger had to change planes and airline companies. Petitioners reply that interline service is superior in value where single-carrier service is infrequent or nonexistent. It is quite unnecessary for us to join this wearisome squabble. The rule of rate-making does not in terms mention 'value of service' as a factor requiring Board consideration; the Board's other stated reasons for the $4 reduction order are fully sufficient to sustain the order; and comparisons between interline and single-carrier service were rendered irrelevant by the Board's decision to defer until later in Phase 4 any analysis of alleged 'discrimination' between the fares charged for these two types of service
 
 
 [34]
 First Order, Finding 2, p. 43
 
 
 [35]
 Id., Finding 12, p. 44
 
 
 [36]
 Order 71-4-59/60 (April 9, 1971) at 75; Order 72-8-50 (Aug. 10, 1972)
 
 
 [37]
 The Board earlier moved a panel of this court to defer judicial review of the Board's adoption of the cost pro-rate principle of dividing joint fare revenues. Motion to Defer Proceedings filed with this court Oct. 2, 1972. While not denying that this adoption was final or that the legal issues were perhaps technically ripe for consideration, the Board contended that 'the ends of proper judicial administration' would best be served by delaying review until the Board had actually implemented the cost pro-rate principle. Id. at 2. Petitioners vigorously opposed this motion, and the court denied it in an order without opinion on Dec. 8, 1972. Our review here of the Board's adoption of the cost pro-rate principle is, of course, consonant with that order. As explained in Part II-C infra, we have concluded that the Board has not yet finally adopted any particular method of making the cost estimates necessary for implementing the cost pro-rate principle
 
 
 [38]
 The considerations of policy which explain and justify the structure of local fares need not be applicable to joint fare divisions. Thus local fares for short flights are often very low, necessitating mail subsidy to local service carriers, because the Board has adopted a conscious policy of fostering air transportation for short distance travelers. It is difficult to see that this policy applies in any way to the issue of interline fare divisions. The division formula has no effect on the movement of traffic on short distance flights. Nor, of course, does the general policy of fostering short distance air travel imply that the Board has adopted, or must adopt, a separate policy that local service carriers receive some fixed percentage of their total revenues from federal subsidy rather than from cost-related fares or revenue divisions
 
 
 [39]
 See, e.g., Trans World Airlines, Inc. v. CAB, 128 U.S.App.D.C. 126, 385 F.2d 648 (1967); Delta Airlines, Inc. v. CAB, 108 U.S.App.D.C. 88, 280 F.2d 636 (1960); American Overseas Airlines, Inc. v. CAB, 103 U.S.App.D.C. 41, 254 F.2d 744 (1958)
 
 
 [40]
 Prior to 1920, the Commission's authority over joint rate divisions was controlled by the Hepburn Act of 1906, 34 Stat. 584, 589-590. Under this legislation, the Commission could prescribe a 'just and reasonable' division of joint rates only if the participating railroads did not themselves reach agreement on a division. See Morgantown & Kingwood Divisions, 40 ICC 509 (1916). The 1920 legislation not only introduced new factors for the Commission to consider in assessing divisions, but also conferred upon the Commission important new powers to intervene in the divisions area on its own initiative. See generally Note, Division of Joint Rates and the Baltimore & Ohio Case, 46 Yale L.J. 811, 811-817 (1937)
 
 
 [41]
 To complete the statutory tableau, 216(f) of the Motor Carrier Act of 1934, 49 Stat. 543, 559, 49 U.S.C. 316(f) (1970), authorized the Commission to set 'just, reasonable, and equitable' divisions of joint motor carrier rates but did not include any mention of the revenue needs of weak carriers
 
 
 [42]
 This is not to deny that the Board may have the power to consider local fares as one factor in determining the reasonableness of joint fare divisions, at least when the structure of local fares is itself reasonable. See Divisions of Freight Rates in Western and Mountain-Pacific Territories, 156 ICC 94, 96 (1929); New England Divisions, 126 ICC 579 (1927). But, even then, the Board should not ignore the fact that local fares and joint fare divisions often raise distinct questions of policy. See note 38 supra
 
 
 [43]
 Like the Examiner's Decision, the First Order had adopted the cost estimates of the Board's Bureau of Economics for interim use in dividing joint fare revenue pending development of better estimates in Phase 9. In the Second Order, however, the Board decided instead to rely in the interim on the divisions formula of the Mohawk Agreement. Thus the Board has not so far adopted a specific cost pro-rate formula even as an interim measure. It has adopted only the principle of dividing revenues according to relative costs