The METROPOLITAN WASHINGTON
BOARD OF TRADE, Petitioner,

v.

PUBLIC SERVICE COMMISSION OF
the DISTRICT OF COLUMBIA,
Respondent.

Potomac Electric Power Company, Apartment & Office Building Association,
People's Counsel, Intervenors.

APARTMENT & OFFICE BUILDING
ASSOCIATION OF METROPOLITAN
WASHINGTON, INC., Petitioner,

v.

PUBLIC SERVICE COMMISSION OF
the DISTRICT OF COLUMBIA,
Respondent.

Potomac Electric Power Company,
People's Counsel, Intervenors.

Nos. 79–1195, 79–1254.

District of Columbia Court of Appeals.

Argued Sept. 3, 1980.

Decided May 20, 1981.

Jerry A. Moore III, Washington, D.C., with whom Raymond R. Dickey, Washington, D.C., was on the briefs, for Metropolitan Washington Board of Trade.

Frann G. Francis, Washington, D.C., for Apartment and Office Building Association of Metropolitan Washington, Inc.

Melvin J. Washington, Asst. Corp. Counsel, Washington, D.C., with whom Judith W. Rogers, Corp. Counsel, and Richard W. Barton, Deputy Corp. Counsel, Washington, D.C., at the time the brief was filed, were on the brief, for respondent.

William Dana Shapiro, Washington, D.C., with whom Edward A. Caine, Washington, D.C., was on the briefs, for Potomac Electric Power Co.

John T. Schell, Washington, D.C., with whom Brian Lederer, Elizabeth A. Noel, and Ralph A. Simmons, Washington D.C., were on the briefs, for People's Counsel.

Onkar N. Sharma, Washington, D.C., filed briefs on behalf of the Washington Metropolitan Area Transit Authority.

Before FERREN and PRYOR, Associate Judges, and GALLAGHER *, Associate Judge, Retired.

GALLAGHER, Associate Judge, Retired:

The Apartment and Office Building Association of Metropolitan Washington (AOBA) and the Metropolitan Washington Board of Trade (Board of Trade) bring consolidated petitions for review of the Final Opinion and Order issued by the Public Service Commission in Formal Case No. 680. In Formal Case No. 680, the Commission considered and adopted marginal cost based, time-of-day (TOD) pricing [1] for large demand customers of Potomac Electric Power Company (PEPCO).

The marginal cost based, TOD pricing system adopted by the Commission reflects a recognition that demand for electricity varies from hour to hour and from season to season and that capital costs and fuel costs generally vary with the level of demand. Marginal cost based, TOD pricing attempts to allocate costs to customers who consume electricity during peak periods, when the cost of providing electricity is high, by charging higher prices per unit of electricity during these peak periods. In theory, marginal cost based, TOD pricing should discourage consumers from using electricity during peak periods and, in so doing, should result in the conservation of energy and in the reduction of capital and fuel expenditures. The Commission, then, adopted the marginal cost based, TOD pricing system, which is challenged by petitioners in this case, in order to promote three goals: (1) rate equity, (2) maximization of efficiency in facility and resource use by electric utilities, and (3) conservation of energy. *See* Part IV *infra*.

---

* Judge Gallagher was an Associate Judge of the Court at the time of oral argument. His status changed to Associate Judge, Retired, on February 27, 1981.

1. TOD pricing is not a new concept. In the early and mid-1930's PEPCO had TOD rates, but abandoned its TOD rate-making system when energy sources were plentiful and the cost of providing service was decreasing. Today, with the cost of providing service increasing, many states have adopted or are experimenting with TOD rates. *See* Formal Case No. 680, Proposed Opinion and Order No. 7002, 31 PUR4th 215, 223 (1979). *See generally* Huntington, *The Rapid Emergence of Marginal Cost Pricing in the Regulation of Electric Utility Rate Structures*, 55 B.U.L.Rev. 689 (1975); *Public Utilities—Rate Design*, 1978 Ann. Survey Am. Law 559.

The arguments of the Board of Trade and AOBA are essentially the same and address three basic questions: (1) whether the marginal cost based, TOD ratemaking principles approved by the Commission are supported by evidence in the record sufficient to allow the Commission to consider adequately the interests of PEPCO and its customers; (2) whether the application of TOD rates at this time only to PEPCO's largest commercial customers is unjustly discriminatory; and (3) whether, during the course of the Commission's exceptions procedure, the Commission properly could consider and adopt a suggested refinement in the methodology originally adopted in the Commission's Proposed Opinion without taking additional evidence. We reject petitioners' arguments that the TOD ratemaking principles approved by the Commission are unjust, discriminatory, and without sufficient record support. We uphold the decision of the Commission.

I. *Facts and Procedural Background*

This appeal arises from Order No. 7034 of the Public Service Commission of the District of Columbia (PSC or Commission), the Final Opinion and Order in Formal Case No. 680. In the course of the proceedings in Formal Case No. 680, the Commission issued Order No. 7002, the Proposed Opinion and Order of the Commission, and Order No. 7034, the Final Opinion and Order.[2] These orders establish the acceptability of adopting time-of-day rates for the large commercial customers served by PEPCO. The Commission stated that their most im-

portant decision in Case No. 680 was that the "TOD rates (particularly energy charges) should generally track PEPCO's marginal costs—that is, PEPCO's cost of producing each additional kilowatt hour[3] of electricity." 31 PUR4th 219, 221 (footnote added). Orders Nos. 7002 and 7034 go on to determine on-peak and off-peak periods[4] and to establish the basic methodology to be used in designing specific TOD rates. These orders, however, did not implement the TOD ratemaking principles by establishing specific TOD rates. The Commission formulated specific TOD rates in another proceeding—Formal Case No. 715.

The Commission ordered PEPCO to install TOD meters for its large commercial customers on November 12, 1975 and allowed PEPCO until July 16, 1977 to complete a study relating to TOD pricing for large commercial customers. PEPCO installed all meters and data processing equipment required to implement TOD pricing for this class of customers. PEPCO also filed tariff proposals and supporting studies relating to the methodology for establishing TOD rates. On August 12, 1977, the Commission issued a Public Notice establishing a prehearing conference for September 15, 1977 and specifying that the tariffs filed by PEPCO would apply to customers whose maximum demand for electricity equaled or exceeded 1,000 kilowatts (kw) during at least two months of the year. The Commission then issued Order No. 5933 on October 19, 1977 specifying the parties to the case, the issues to be litigated,

**2.** The Commission generally adopted its Proposed Opinion (31 PUR4th 219 (1979)) in its Final Opinion (31 PUR4th 249, 251 (1979)). Throughout this opinion, we distinguish between the Proposed and Final Opinions only when referring to modifications of the Proposed Opinion.

**3.** A "kilowatt" (kw) is a unit of power equal to 1000 watts. A "kilowatt-hour" (kwh) is a unit of work or energy expended by one kilowatt in one hour.

**4.** The adopted time-of-day and seasonal rating periods are as follows:

1. *On-Peak*

| | |
|---|---|
| Summer | Noon–8 p.m. Weekdays June—September |
| Winter | Noon—8 p.m. Weekdays October—May |

2. *Intermediate*

| | |
|---|---|
| Summer | 8 a.m.—Noon & 8 p.m.—Midnight Weekdays, June—September |
| Winter | 8 a.m.—Noon & 8 p.m.—Midnight Weekdays, October—May |

3. *Off-Peak*

| | |
|---|---|
| Weekdays | Midnight—8 a.m.; All months |
| Weekends and Holidays | All hours |

*See* 31 PUR4th at 242–43.

and the procedural ground rules. The parties prefiled testimony concerning TOD ratemaking principles and specific methodologies for formulating TOD rates. Hearings for cross-examination of this testimony began on October 24, 1978 and concluded on March 27, 1979.

The Commission issued its Proposed Opinion on June 28, 1979. AOBA, the Board of Trade, and PEPCO filed exceptions to the Proposed Opinion. In response to a problem concerning the application of the TOD rate principles set forth in the Proposed Opinion raised by PEPCO during the oral argument on exceptions, interested parties held a conference on August 8, 1979 to formulate a solution to the problem identified by PEPCO.[5] On the basis of their discussions and the evidence of record before the Commission, the parties submitted a report containing a proposed modification to the Commission's TOD rate design.

On September 7, 1979, the Commission issued its Final Opinion, which essentially adopted the Proposed Opinion. 31 PUR4th 249, 251. There were some modifications including the adoption of the proposal which had emerged from the conference. AOBA and the Board of Trade filed applications for reconsideration of Order No. 7034 which the Commission denied on October 16, 1979. These petitions for review were then timely filed. See D.C.Code 1973, § 43–705.

II. *Ripeness and Finality*

For jurisdictional purposes we will proceed to discuss the procedural posture of this case in order to determine whether judicial review is appropriate at this time. See D.C.Code 1973, § 43–705;[6] *Goodman v. Public Service Commission,* 151 U.S.App.

D.C. 321, 467 F.2d 375 (1972). *See also Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Specifically, we must analyze the relationship between Formal Case No. 680, which adopted basic TOD ratemaking principles, and Formal Case No. 715, which formulated the actual TOD rates, in order to determine whether judicial review of basic TOD principles, without considering specific TOD rates, would impermissibly interfere with the administrative decision-making process. *See Abbott Laboratories, supra* at 148, 87 S.Ct. at 1515. We conclude that judicial review is appropriate at this time.

In the context of protracted administrative proceedings, it is particularly difficult to determine precisely when an agency has issued a "final order" and when an administrative action is ripe for review.[7] Many courts do not address the problem at all, but intuitively seem to accept the order before them as final and proceed directly to the merits. *See, e. g., New York State Council of Retail Merchants, Inc. v. Public Service Commission,* 45 N.Y.2d 661, 384 N.E.2d 1282, 412 N.Y.S.2d 358 (1978) (TOD ratemaking case). In *Abbott Laboratories v. Gardner, supra,* the Supreme Court adopted a flexible approach to determine finality and ripeness and articulated the basic rationale of the ripeness doctrine:

> [I]t is fair to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. [*Id.* 387 U.S. at 148, 87 S.Ct. at 1515.]

---

**5.** *See* Part VI *infra.*

**6.** Section 43–705 provides in pertinent part:

The District of Columbia Court of Appeals shall have jurisdiction to hear and determine any appeal from an order or decision of the Commission. Any public utility or any other person or corporation affected by any final order or decision of the Commission ... may, within sixty days after final action by

the Commission upon the petition for reconsideration, filed with the clerk of the District of Columbia Court of Appeals a petition of appeal setting forth the reasons for such appeal and the relief sought. . . .

**7.** For a discussion of the distinction between the requirement of finality and the doctrine of ripeness, see K. Davis, Administrative Law Text § 20.01, at 356 (1959).

The Court went on to formulate a two-pronged test that requires courts "to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515.

Courts have applied the *Abbott Laboratories* test in a number of ratemaking cases. *See, e. g., American Airlines, Inc. v. CAB*, 161 U.S.App.D.C. 430, 495 F.2d 1010 (1974); *Continental Air Lines v. CAB*, 173 U.S.App.D.C. 1, 522 F.2d 107 (1974);[8] *Goodman v. Public Service Commission, supra.* These cases have made clear that, in the context of protracted ratemaking proceedings an agency order establishing basic ratemaking principles may satisfy the requirements of finality and ripeness although the agency formulates the actual rates in a later, related proceeding.

In light of the guidelines set down and applied in *Abbott Laboratories* and its progeny, we turn now to examine the relationship between Formal Case No. 680 and Formal Case No. 715. Apparently, when Case No. 680 was instituted, the Commission expected to formulate the principles upon which to base TOD rates as well as to place specific TOD rates into effect as part of its Final Order. Because the Commission then granted PEPCO two general rate increases in Formal Case No. 685 (29 PUR4th 517, 29 PUR4th 585) and Case No. 715, however, it was no longer feasible to adopt precise TOD rates as a part of Formal Case No. 680. Specific TOD rates had to be designed to collect more money from the large commercial customers than was originally contemplated by the revenue requirement[9] shown on the record in Formal Case No. 680. The Commission therefore directed PEPCO to amend its application for a general rate increase in Case No. 715 to include rate schedules for the TOD customers on the principles announced in its Final Opinion in Formal Case No. 680 because of the Commission's belief "that Formal Case No. 715 provides the best vehicle for handling implementation." 31 PUR4th at 244. Significantly, however, the Commission noted that "the issues in Formal Case No. 680 which have been resolved in this opinion will not be open for further review in Formal Case No. 715." *Id.*[10] Finally, the Commission

8. *American Airlines* and *Continental Air Lines* are connected cases which reviewed various phases of a Civil Aeronautics Board investigation.

9. The traditional focus of formal rate proceedings is on establishing the general level of revenues necessary to cover its operating expenses and to earn a return on its invested capital to meet its interest obligations on outstanding debt, to compensate stockholders, and to attract new capital when necessary. Once the revenue requirement is established, a "rate design" must be developed. The term "rate design" generally refers to both rate relationships among different classes of electric utility customers as well as differentials among customers within each class. The rate design, then, determines the specific rates different classes of customers should pay in order to generate the required revenues. The rates themselves are generally composed of four basic charges— an energy charge, a production and transmission charge, a distribution charge, and a customer charge. *See generally* Huntington, *supra* note 1, at 689–719.

10. The record in Formal Case No. 715 is not now before us. The actual Order No. 7135 issued in Formal Case No. 715, however, contains only one reference to Order No. 7002 in Formal Case No. 680 and the methodology for designing TOD rates for large commercial customers. In Formal Case No. 715, the Apartment and Office Building Association (AOBA) apparently argued to the Commission that PEPCO's proposed TOD rate schedule for large commercial customers be rejected as not in compliance with Order No. 7002, because PEPCO did not base its TOD rates on its own marginal running costs. PEPCO apparently used the running costs of the Pennsylvania-New Jersey-Maryland (PJM) power pool from which PEPCO can purchase additional generating capacity. The PJM power pool centrally dispatches its member utilities' generation facilities so that the most efficient mix of plants will be available to satisfy the requirements of the pool as a whole. 31 PUR4th at 231. See note 38 *infra*, for further discussion of the relationship between PEPCO and the PJM power pool. Without undercutting the finality of its opinion issued in Formal Case No. 680 as to the appropriateness of adopting marginal cost, TOD pricing for PEPCO's large commercial customers, the Commission then explained:

Our preference in Order No. 7002 (pp. 26–28) for the use of PEPCO's running costs over the PJM lambda [PJM's running costs] for marginal costs cannot be read to mean that PJM lambda costs may not be reason-

noted that, although the rates in Case No. 715 should be developed in accordance with the methods and principles approved by the Commission in Case No. 680, the rates "will be based on PEPCO's marginal costs and billing determinants for the test year used in Formal Case No. 715." The Commission promised that the parties would have the opportunity "to explore the consistency of PEPCO's development of the proposed TOD rates with this decision, as well as any underlying data—not part of the record in Formal Case No. 680—which are used to develop the rates." *Id.*

Pursuant to Order No. 7135 in Formal Case No. 715, PEPCO filed its schedules of rates for District of Columbia retail sales of electricity. These rate schedules, including the TOD rate schedules for large commercial customers, became effective on May 31, 1980 with the issuance of Order No. 7143.

In the case before the court, many of the same factors are present that swayed the court in *Continental Air Lines, Inc. v. CAB, supra,* to find that the agency decision was final and ripe for review under the *Abbott Laboratories* test. This court can competently explore the basic threshold issues presented in this case outside the setting of a concrete application of marginal cost based, TOD principles, and there is every indication that the Commission considered its decision to be final.[11] Thus, the first prong of the *Abbott Laboratories* test has

been satisfied: the issues are fit for judicial review.

In considering the second prong of the *Abbott Laboratories* test—"the hardship to the parties of withholding judicial review" —it is significant that those large commercial customers who have not changed their electricity consumption patterns began paying the higher peak-load prices on May 31, 1980. Should this court postpone reviewing the threshold issues decided by the Commission in Federal Case No. 680, the parties would be forced to continue paying TOD rates. If this court should then decide when it reviews the TOD rates issued in Formal Case No. 715[12] that TOD principles formulated by the Commission should not have been implemented, large commercial customers would have been forced to pay higher rates unnecessarily during the additional period of delay.[13]

Utilizing the flexible and common sense approach articulated in *Abbott Laboratories* and applied in *Continental Air Lines,* then, we conclude that it is appropriate for this court to review the Commission's decision to implement marginal cost based, TOD pricing. We are not abandoning the requirements of finality and ripeness which generally permit review of only those Commission decisions that are accompanied by specific and concrete rate schedules. *See, e. g., Potomac Electric Power Co. v. Public Service Commission,* D.C.App., 380

---

ably substituted for PEPCO's costs in instances, such as we have here, where PEPCO's costs, themselves, produce unreasonable results. PEPCO's rates and supporting calculations filed here conform in substance with that methodology. [Formal Case No. 715, Order No. 7135, at 104.]

The Commission concluded:

We agree with People's Counsel that when the period in which data is collected changes there will almost inevitably crop up new anomalies or problems will likely appear with the new data base. PEPCO's adjustments are on this record reasonable adjustments to produce appropriate estimates of marginal distribution costs and marginal energy costs. Accordingly, we accept them for implementation. [*Id.*]

11. *See Continental Air Lines, Inc. v. CAB, supra,* 173 U.S.App.D.C. at 18–19 & n.5, 522 F.2d

at 124–25 & n.5. We find the Commission's determination of finality persuasive, but we note, as did the panel in *Continental AirLines* that the label an agency or Commission attaches to its action is not necessarily determinative.

12. The specific rate schedules formulated and approved in Formal Case No. 715 have been challenged and these appeals currently are pending.

13. *Accord, Continental Air Lines, Inc. v. CAB, supra* at 21, 522 F.2d at 127. In *Continental Air Lines,* the court stressed that "[e]ven assuming that the courts would ... afford a realistic chance to challenge the Board's policy at [a] later juncture, still the delay works a considerable hardship."

A.3d 126 (1977) *rev'd on other grounds on rehearing,* 402 A.2d 14 (en banc), *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979); *Goodman v. Public Service Commission,* D.C.App., 309 A.2d 97 (1973). We are simply acknowledging that in cases such as the one before the court, where the Commission has made threshold ratemaking policy decisions and has denominated them as final decisions, and where the court can understand and evaluate these decisions outside the context of a specific rate structure, postponing review would serve no purpose. Reviewing such decisions would not entangle this court in abstract disagreements over administrative policies. Postponing review until completion of the Commission's charted course, in fact, would lead to unnecessary delays and would waste the Commission's resources if the court ultimately were to find the Commission's decision to be arbitrary and discriminatory on the most basic level.

Although we find that the basic TOD principles are ripe for review, we stress that our review of this case is narrowly restricted. We venture no opinion on the separate legal and empirical problems which may be raised by the actual application of the TOD ratemaking principles.[14]

### III. *Role of the Commission, Scope of Review, and the PURPA Mandate*

We turn now to a discussion of the role of the Commission and the appropriate standard of review that we must apply in the instant case.

The Commission, not this court, has the responsibility for establishing rate designs and for setting specific utility rates. D.C.Code 1973, §§ 43–301, –401, –411. Rate design principles and specific rates approved by the Commission, however, must be "reasonable, just, and nondiscriminatory." D.C.Code 1973, § 43–301. This statutory authority is deliberately broad and gives the Commission authority to formulate its own standards and to exercise its ratemaking function free from judicial interference, provided the rates fall within a zone of reasonableness which assures that the Commission is safeguarding the public interest—that is, the interests of both investors and consumers. *Washington Gas Light Co. v. Baker,* 88 U.S.App.D.C. 115, 118–19, 188 F.2d 11, 14–15 (1950), *cert. denied,* 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686, *appeal after remand,* 90 U.S.App.D.C. 98, 195 F.2d 29 (1951). From the investor standpoint, courts have defined the lower boundary of this zone of reasonableness as "one which is not confiscatory in the constitutional sense." *Federal Power Commission v. Natural Gas Pipeline Co.,* 315 U.S. 575, 585, 62 S.Ct. 736, 742, 86 L.Ed. 1037 (1942); *Washington Public Interest Organization v. Public Service Commission,* D.C. App., 393 A.2d 71, 76 (1978), *cert. denied sub nom. Potomac Electric Power Co. v. Public Service Commission,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979). From the consumer standpoint, the upper boundary cannot be so high that the rate would be classified as *"exorbitant."* See *Washington Public Interest Organization v. Public Service Commission, supra,* at 76; *Wash-*

---

14. *Accord, American Airlines, Inc. v. CAB, supra.* In *American Airlines,* the petitioner challenged two orders entered in phase four of the Board's Domestic Passenger Fare Investigation. The Board had decided, *inter alia,* that joint fare revenues should be divided on a "cost pro-rate" basis, whereby a carrier's percentage share would equal that carrier's percentage share of the total costs incurred in providing the interline flight. In affirming the Board's decision that joint revenues should be divided on a "cost pro-rate" basis, the court noted that phase four proceedings were still in progress and carefully limited its affirmance to the Board's completed decision to adopt the princi-

ple of dividing revenues according to relative costs. The court, however, did not construe the Board's orders as adopting the "industry average" method of constructing a cost prorate formula and, therefore, did not feel that the Board's sentiments favoring the "industry average" method constituted a final order adopting that method. Thus, the court emphatically stated that it was venturing "no opinion on the separate legal and empirical problems which may be raised by measurement of those costs and actual application of the principle." 161 U.S.App.D.C. at 433, 495 F.2d at 1013.

*ington Gas Light Co. v. Baker, supra* 88 U.S.App.D.C. at 119, 188 F.2d at 15.

■ In order to define the reasonableness requirement of § 43–301, in the specific context of this case, the Commission appropriately has looked to the recent expression of Congressional policy contained in the Public Utility Regulatory Policies Act of 1978 (PURPA).[15] Title I of PURPA, 16 U.S.C. §§ 2611–2644 (Supp.III 1979), requires each state [16] regulatory authority to consider implementing several specified ratemaking standards if it finds that the standards would achieve one of three explicit goals—conservation of electricity, maximization of efficiency in facility and resource use by electric utilities, and assurance of equitable rates to consumers—without undermining the other goals. *See* 16 U.S.C. §§ 2611, 2621(a); H.R.Rep. No. 95–1750, 95th Cong., 2d Sess. 63, 69, *reprinted in* [1978] U.S.Code Cong. & Ad.News 7797, 7803. The PURPA standards require, *inter alia*, that rates charged by any electric utility to each class of consumers reflect as well as possible the cost of providing the service to the class; and that time-of-day rates be used unless shown to be cost-ineffective for the class under consideration. 16 U.S.C. § 2621(d)(1)–(4). *See generally* Note, *The Constitutionality and Effectiveness of the Electric Utility Provisions of the Public Utility Regulatory Policies Act of 1978*, 47 Geo.Wash.L.Rev. 787 (1979).

Orders of the Commission are subject to judicial review for a determination of whether the Commission's orders are reasonable under § 43–301. This court has "jurisdiction to hear and determine any appeal from an order or decision of the Commission." D.C.Code 1973, § 43–705. *See also* D.C.Code 1973, § 11–722. Judicial review of a utility commission order, however, has been described as the narrowest judicial review in the field of administrative law. *See Potomac Electric Power Co. v. Public Service Commission*, D.C.App., 402 A.2d 14,

17, *cert. denied*, 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979). Our review is "limited to questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary, or capricious." D.C.Code 1973, § 43–706. *See People's Counsel v. Public Service Commission*, D.C.App., 399 A.2d 43 (1979); *Washington Public Interest Organization v. Public Service Commission, supra; Chesapeake & Potomac Telephone Co. v. Public Service Commission*, D.C.App., 330 A.2d 236 (1974).

These statutory criteria are similar to those that governed the Federal Power Commission and the review of its decisions by the federal courts. *Washington Gas Light Co. v. Baker, supra*, 88 U.S.App.D.C. at 118, 188 F.2d at 14. In that context, the Supreme Court has held that unless the overall effect of a rate is "unjust and unreasonable," the Commission's order should be approved, irrespective of "infirmities" in the methodology used to calculate it. *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944). The Court observed that an order in a ratemaking case, as "the product of expert judgment," is presumptively valid and should be upheld unless a petitioner makes a "convincing showing" that it fails to meet the statutory criteria. *Id.*

■ Before meaningful judicial review to determine the reasonableness of a Commission decision is possible, the Commission, of course, must satisfy its own burden: to base its decision on sufficient evidence and to explain its actions "fully and carefully." As the Supreme Court has noted in an analogous context:

Judicial review of the Commission's orders will . . . function accurately and efficaciously only if the Commission indicates fully and carefully the methods by which, and the purposes for which, it has

---

**15.** Pub.L. No. 95–617, 92 Stat. 3117 (codified in scattered sections of 15, 16, 42, 43 U.S.C. (Supp.III 1979)).

**16.** Under PURPA, the term "state" includes the District of Columbia. *See* 16 U.S.C. § 2602(15) (Supp.III 1979).

chosen to act .... [*Permian Basin Area Rate Cases*, 390 U.S. 747, 791–92, 88 S.Ct. 1344, 1372–73, 20 L.Ed.2d 312 (1968).] *See also Washington Public Interest Organization v. Public Service Commission, supra* at 75–77. Once the Commission has satisfied this initial burden and has issued a decision, however, the burden of petitioner on appeal to demonstrate reversible error is considerable. More than a difference of opinion with the Commission must be asserted, for "[t]he court's responsibility is not to supplant the Commission's balance of [the relevant public] interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors." *Id.* Petitioner therefore must establish "clearly and convincingly a fatal flaw in the action taken ...." *Goodman v. Public Service Commission, supra*, 309 A.2d at 101. *See also People's Counsel v. Public Service Commission, supra* at 46.

In this case, the Commission specifically found that TOD rates would further rate equity and potentially would further the other two PURPA goals as well. Having made this threshold finding of reasonableness, the Commission then determined that TOD rates would not be cost-ineffective, 16 U.S.C. § 2621(d)(3), for the class under consideration—that is, PEPCO's large commercial customers. The Commission therefore found that it is "reasonable" and "appropriate," D.C.Code 1973, § 43–301 and 16 U.S.C. § 2621(a), to implement PURPA's TOD standard for this class of customers. 31 PUR4th 249, 257.

Petitioners, to meet their burden in the context of this case, must establish "clearly and convincingly a fatal flaw" in the Commission's decision to adopt what is essentially an experimental marginal cost based, TOD ratemaking scheme. *Goodman v. Public Service Commission, supra*, 309 A.2d at 101. It is not enough that petitioners establish that there are perhaps better principles upon which to base a rate structure or that a more accurate methodology for establishing marginal cost based, TOD rates exists. It is not enough to show that one or

more of the goals of a TOD ratemaking scheme may not be achieved or that some consumers may pay higher rates under a TOD ratemaking scheme than they paid under the former system. Petitioners must demonstrate that the TOD ratemaking scheme adopted by the Commission is unreasonable and arbitrary—that is, that there is little potential for the Commission to achieve one of its goals without undercutting the other goals—or that the resulting rates will be "exorbitant" from the consumer standpoint. They must point to specific factors, crucial to making a determination that there is potential for at lease one of the goals of the TOD ratemaking scheme to be achieved, that were not "fully and carefully" explained by the Commission. *Permian Basin Area Rate Cases, supra*, 390 U.S. at 791–92, 88 S.Ct. at 1372–73. Petitioners' burden is thus substantial, but necessarily so, for a lighter burden would preclude the Commission from engaging in the kind of well-considered experimentation necessary to fulfill its ratemaking function. *Cf. Austral Oil Co. v. FPC*, 428 F.2d 407, 418 (5th Cir.), *cert. denied*, 400 U.S. 950, 91 S.Ct. 241, 27 L.Ed.2d 257 (1970) (Commission is to be affirmed if it has followed the correct legal standards and acted on the basis of substantial evidence, and under any fair interpretation of *Permian* it appears that legal standards are to be construed liberally when applied to area rate regulation—a regulatory effort still in the experimental stage.). We approach petitioners' arguments mindful of the burden petitioners bear.

### IV. *Adequacy of the Commission's Consideration of the Consumers' Interests*

We now turn to the principal issue before the court: whether the Commission has considered adequately the impact that the TOD ratemaking principles adopted will have upon consumers. The Commission considered the interests of PEPCO and PEPCO's customers in the context of a cost-benefit analysis. After a brief discussion of the theory of marginal cost based, TOD pricing, we begin our discussion of the Commission's decision by focusing on this cost-benefit analysis.

A. *Theory and Objectives of Marginal Cost Based, Time-of-Day Pricing*

Marginal cost based, TOD pricing is based on two fundamental observations: that demand for electricity varies from hour to hour and from season to season, and that capital costs and fuel costs generally vary with the level of demand. An increase in demand during peak consumption periods may result in increased capital costs, for electric utility companies must have sufficient generation, transmission, and distribution capacity to meet the maximum aggregate demand placed on their systems at any given time. Therefore, even if much of the capacity needed to meet the maximum aggregate demand during peak consumption periods lies idle for substantial periods of time, electric utility companies still must incur the additional capital costs necessary to meet the demand for electricity during these peak periods. An increase in demand during peak consumption periods is also likely to result in higher fuel costs, for electric utility companies normally have their most fuel efficient generators in service almost continuously and use their less efficient and more costly equipment only as demand increases. *See generally* Huntington, *The Rapid Emergence of Marginal Cost Pricing in the Regulation of Electric Utility Rate Structures*, 55 B.U.L.Rev. 689, 690 (1975).[17]

Having made these observations, we turn to a discussion of the theory of marginal cost based, TOD pricing and the three primary goals such a pricing system offers: (1) rate equity, (2) maximization of efficiency in facility and resource use by electric utilities, and (3) conservation of energy. *See* 31 PUR4th at 223–26.

The first goal of marginal cost based, TOD pricing—rate equity—generally is achieved by designing a rate scheme that aligns a customer's rates as closely as possible with the costs that this customer actually imposes on the system. Under a rate system that is not designed to align customers' rate with the costs that these customers impose on the system, the customers may think it is cheaper to produce an additional unit of electricity than it really is and consequently be led to expand their consumption beyond the point that is socially efficient or desirable. Marginal cost based, TOD pricing, by definition, requires that the price of a unit of electricity reflect the cost of producing and distributing that unit of electricity. Under a marginal cost based, TOD pricing system, then, the consumers should receive accurate price signals. These price signals should enable consumers to recognize the costs they are imposing upon society and to decide whether to alter their consumption patterns or pay the price.

The second goal of a marginal cost based, TOD pricing system—maximization of efficiency in facility and resource use by electric utilities—is based on the theory that, if the price of a unit of electricity reflects the cost of producing and distributing that unit of electricity, consumers will be induced to shift their load from peak periods to off-peak periods. The cost of producing and distributing that unit of electricity, as we have just observed, generally varies depending upon the level of demand. An additional unit of electricity is most expensive if capital expenditures are required to meet the new level of demand, but marginal costs also increase during peak-load periods if the existing, less fuel-efficient generators must be utilized. Therefore, a utility could save both fuel and capital expenditures if it could reduce its system peak by transferring or "shifting" a portion of its peak load to an off-peak period. Many authorities agree that an effective way to reduce peak level consumption is to implement marginal cost based, TOD pricing. *See generally* Huntington, *supra* note 1.

17. In the words of Richard Galligan, an expert witness who testified before the Commission:

Some generating units use less expensive fuel, such as nuclear fuel or coal, than other generating units, which may use residual fuel oil or diesel oil. And even for generating units that use the same type of fuel, some units make more efficient use of that fuel than other units. The result is that some generating units have higher fuel costs per kilowatt-hour than other generating units. [R. 3189.]

354

The third goal of a marginal cost based, TOD ratemaking system is the conservation of energy, that is, an overall reduction in electricity consumption. The theory is that if consumers are given the proper price signals—if prices during the peak period are based on the costs of producing energy during that period—these consumers will be induced to consume less than if the price of electricity were based on non-TOD averaging techniques.

These three goals are interrelated to a degree. At the same time, however, each goal is essentially independent of the other goals and important in itself. Thus, although maximization of efficiency in facility and resource use through load-shifting is one important goal, many TOD pricing advocates would not be disturbed if load-shifting does not occur. Rate equity still can be achieved, for consumers will be faced with the appropriate costs in determining their consumption patterns. *Id.* at 725–26. Conservation of energy can occur by a simple reduction in consumption, and, therefore, this goal also can be achieved regardless of whether load-shifting occurs.

### B. *The Commission's Cost-Benefit Analysis*

The Commission considered both the costs and the benefits of implementing TOD rates. In analyzing the potential benefits to PEPCO's customers, the Commission considered each of the three goals enumerated above. In analyzing the costs, the Commission considered both the costs incurred by PEPCO and by PEPCO's large commercial customers, to the extent that it was possible to do so. Petitioners essentially attack the adequacy of the Commission's analysis of the potential benefits to PEPCO's customers and of the potential costs to PEPCO's large commercial customers. They argue that the Commission's decision to adopt marginal cost based, TOD ratemaking principles is arbitrary and without substantial evidence in the record and thus warrants reversal. We turn now to the specific arguments of the petitioners.

Petitioners make two basic arguments attacking the adequacy of the benefit portion of the Commission's cost-benefit analysis. Petitioner AOBA focuses almost entirely on the fact that there is inadequate evidence of record to indicate that PEPCO's large commercial customers will alter their electricity consumption patterns so that load-shifting will occur and that, therefore, there is inadequate evidence that marginal cost based, TOD pricing will further one of the Commission's articulated goals—maximization of efficiency and resource use by electric utilities. The underlying premise of petitioner's argument is that the Commission is required to perform a rigid cost-benefit analysis and to reject any TOD ratemaking scheme unless record evidence demonstrates that TOD rates clearly will further all three of the Commission's articulated goals. Neither the Commission's statutory directives nor the applicable provisions of PURPA place this kind of burden on the Commission. Thus, petitioner has distorted the burden on the Commission as well as its own burden on appeal. As we have indicated, petitioners' burden on appeal is substantial. It is not enough that petitioners show that one or more of the goals of a TOD ratemaking scheme may not be achieved. Petitioners must demonstrate that the TOD ratemaking scheme adopted by the Commission is unreasonable and arbitrary—that is, that there is little potential for the Commission to achieve one of its goals without undercutting the other goals—or that the resulting rates will be "exorbitant" from the consumer standpoint. They must point to specific factors, crucial to making a determination that there is potential for at least one of the goals of the TOD ratemaking scheme to be achieved, that were not "fully and carefully" explained by the Commission. *Permian Basin Area Rate Cases, supra*, 390 U.S. at 791–92, 88 S.Ct. at 1372–73.

The fundamental problem with petitioner AOBA's argument, then, is that it completely ignores the possibility that the other two goals—conservation of energy and rate equity—will be achieved through the implementation of the Commission's TOD rate-

making scheme. Even if maximization of efficiency in facility and resource use by electric utilities through load shifting does not occur, as the Commission noted, TOD rates will encourage energy conservation through a simple reduction in consumption effectuated by the installation of pre-cooling devices or of more efficient electricity consuming equipment. 31 PUR4th at 225. *Accord, New York State Council of Retail Merchants, Inc. v. Public Service Commission, supra,* 45 N.Y.2d at 673–74 384 N.E.2d at 1288, 412 N.Y.S.2d at 364–65.[18] The Commission, in fact, explicitly stated that load-shifting was not the most important goal for adopting TOD rates, but rather that the primary goal was rate equity:

> [T]he potential for load shifting and resulting cost reductions are not the only reason we are adopting TOD rates in this case. We would adopt TOD rates even if that potential were more dismal. This is because TOD rates' contribution to greater rate equity . . . is even more important to us than load reductions or load shifts. Recognizing that under a non-TOD rate structure many customers subsidize other customers, the commission views the current rate structure as incorporating an undesirable form of cross-subsidization among large commercial customers. [31 PUR4th at 225.]

AOBA fails to address the Commission's concern with conservation of energy and rate equity.

Aside from this fundamental problem with AOBA's argument, we note that there is at least some evidence that PEPCO's large commercial customers will reduce their peak-load requirements or shift their electricity requirements from on-peak to off-peak periods.[19] We are not unmindful that load-shifting is an important goal of a TOD pricing system or that it would be helpful to have additional information on the degree of load-shifting that will occur. Yet, there is a great deal of uncertainty connected with any estimate of potential load-shifting, and, as the Commission recognized, elaborate studies would not dispel this uncertainty.[20] We agree with the Commission and with the New York Court of Appeals that "[i]t is enough that TOD rates create a potential for such load changes." 31 PUR4th at 224. *Accord, New York State Council of Retail Merchants, Inc. v. Public Service Commission, supra* at 669–71,

---

**18.** The New York Court of Appeals observed: Even in the absence of proof that each of the affected consumers had an elasticity of demand in consequence of which it could respond to price signals, it cannot be concluded that the new rate structure will not produce significant changes in consumption patterns, whether by way of shifts from peak period consumption to consumption in off-peak or shoulder periods or by way of reduced consumption of energy in consequence of the installation of more efficient electricity using equipment or the redesign of present equipment to achieve the same end.

**19.** *See* Testimony of Richard S. Bower, Commission Staff, at R. 1693:
Q. You contemplate it will move by 1, 2 or 3 percent [*sic*] your rate is in effect?
A. Yes.
Q. And that will be repeated year after year?
A. No, there will continue to be changes; how great I would not want to guess.

**20.** The Commission observed that experience alone would enable them to determine which customers will respond to TOD rates by reducing or shifting load and added:

There is also a serious question as to whether some of AOBA's proposed studies would produce reliable information if they were conducted. Some of the studies require significant input from the customers themselves. It would be necessary to ask individual customers how much load they could move from one time period to another. And customers alone can tell PEPCO how much current rates would have to be reduced before they would shift load from a peak period to an off-peak period. It is only natural that customers would respond to suit what they perceive to be in their best interests. In short, AOBA's studies may, by their very nature, elicit biased answers which the commission could not legitimately rely upon in deciding the merits of TOD rates. [31 PUR4th at 228.]
*See also New York State Council of Retail Merchants, Inc. v. Pub.Serv. Comm'n, supra* at 673–74, 384 N.E.2d at 1288, 412 N.Y.S.2d at 364–65 ("It will only be after the new rates have been in operation that the practical effect of the carrot and the club can reliably be measured.").

384 N.E.2d at 1286, 412 N.Y.S.2d at 362–63.[21]

Petitioner Board of Trade takes a different tack and focuses on the Commission's consideration of its stated, primary goal—rate equity. Board of Trade's principal argument is that TOD rates cannot possibly promote rate equity in the District of Columbia, for the fundamental prerequisite for TOD rates—that the cost of providing service varies by the time of day—is not present. This fundamental prerequisite is not present, petitioner argues, because PEPCO currently has substantial excess generating capacity. Petitioner maintains that if a utility already has too much capacity and increased customer usage does not require new capacity construction, there is no capacity-related loss to the utility from that usage. Therefore, Board of Trade argues, the generation costs necessary to support a TOD generation demand charge do not exist. Petitioner concludes that a TOD rate structure which relies on such non-existent costs will not promote rate equity, but rather will promote rate inequity.

We find this argument puzzling. We note that PEPCO's revenue requirement is recovered through four basic charges: (1) the energy charge, which covers the cost of running the electricity producing generators—principally the cost of fuel; (2) the demand charge associated with generation (or production) and transmission, which covers the costs of constructing, operating, and maintaining the utility's generation and transmission facilities, exclusive of fuel; (3) the demand charge for distribution costs, which covers the cost of transmitting electricity from power substations to the customer's premises, including all costs associated with construction, maintenance, and repair of the utility's distribution system; and (4) the customer charge, which covers the costs of attaching a customer to the system and maintaining a readiness to serve the customer, including the costs associated with meter reading, customer accounting and billing, and service lines and meter installations on the customer's premises.[22] Surplus generation capacity is relevant to a determination of how much of PEPCO's revenue requirement, if any, should be recovered through one of the four charges delineated above—the generation and transmission charge. Surplus generating capacity, however, has no direct effect on the cost of fueling and running the generators to produce electricity. 31 PUR4th at 230. There is ample evidence in the record that PEPCO's fuel costs increase during peak periods, for PEPCO uses their less efficient and more costly generating equipment only during periods of high demand.

**21.** The New York Court of Appeals stated:

> The group selected was making substantial payments to LILCO and thus had a real potential for usage responsiveness .... There was warrant for the hope that some significant decrease in the use of inefficient generating facilities might be realized, even without proof as to the precise degree of elasticity in energy consumption among the included consumers.

**22.** For guidance only, the Commission provides a rate statement which shows the TOD rates which the Commission would have adopted if it had used the 1975 revenue requirement of record in Formal Case No. 680. 31 PUR4th at 221 n.5, 251; R. 4499.

RATE SCHEDULE
[Based on 1975 Revenue Requirement]

ENERGY (KWH) CHARGE

|  | Summer | Winter |
|---|---|---|
| Peak | $ .027 | $ .021 |
| Intermediate | .023 | .020 |
| Off-Peak | .018 | .018 |

PRODUCTION AND TRANSMISSION (KW) CHARGE

|  | Summer | Winter |
|---|---|---|
| Peak | $6.07 | $0.0 |
| Intermediate | 0.0 | 0.0 |
| Off-Peak | 0.0 | 0.0 |

DISTRIBUTION (MAXIMUM KW) CHARGE

$4.54/mo/KW for the highest KW reading for the current or previous 11 months.

CUSTOMER CHARGE: $210/month

The Commission set out the revenue to be derived from these sample rates at R. 4501 (footnotes omitted):

| ENERGY CHARGES | | $49,227,580 |
|---|---|---|
| DISTRIBUTION CHARGE | | 33,886,604 |
| CUSTOMER CHARGE | | 519,120 |
|  | Subtotal | $83,633,304 |
| PRODUCTION AND TRANSMISSION CHARGE | | 13,966,696 |
| Total Revenue Requirement | | $97,600,000 |

*See* Testimony of Richard S. Bower, Commission Staff, at R. 2985; Richard A. Galligan, Hotel Association of Washington, D. C., at R. 3182–97; Frank S. Walters, PEP-CO, at R. 2627–31; and Alexander E. Wiskup, AOBA, at R. 3036–44. Contrary to Board of Trade's broad assertion, then, there is ample evidence that the cost of providing service varies by time of day and by season, even if PEPCO does not incur construction costs in the near future to meet increasing demands for electricity. 31 PUR4th at 221.

More importantly, it is clear to this court that the Commission considered both the variation of fuel costs and the existence of excess capacity when it adopted its TOD ratemaking principles and methodology. The energy charge, which recovers fuel costs, was designed to vary depending on whether the electricity was used during peak, intermediate, or off-peak periods. The Commission then considered whether a portion of PEPCO's revenue requirement should be recovered through a charge for generating capacity. After careful consideration, the Commission rejected the argument that excess capacity should preclude PEPCO from charging for generating capacity. The Commission observed:

Staff witness Bower alone would exclude such [generating] capacity from PEPCO's demand charges. He would limit these charges to the recovery of transmission costs on the theory that PEPCO has enough extra generating capacity to avoid building new units to meet peak-load growth for the next few years.

We concur with witness Galligan that Dr. Bower's recommendation may engender serious rate instability; therefore, we will not adopt it. While at the present time PEPCO may have a large generating capacity reserve, it would be unreasonable to assume that this condition will prevail indefinitely. When PEPCO does add new generating capacity, the commission would have to include that capacity in the demand charges. This could cause sharp rate increases at that time. The commission believes that the better course is to include generating capacity now and thereby smooth out PEPCO's rates in the long term. [31 PUR4th at 233.][23]

Having given reasoned consideration to the excess capacity argument, the Commission did not find that TOD rates would lead to rate inequities due to PEPCO's excess generating capacity. The Commission explained "fully and carefully" why TOD rates were needed to promote its primary goal of rate equity and why a generation charge is needed. *Permian Basin Area Rate Cases, supra,* 390 U.S. at 791–92, 88 S.Ct. 1372–73. Petitioner Board of Trade has demonstrated no "fatal flaw" with respect to this aspect of the Commission's decision. *Goodman v. Public Service Commission, supra,* 309 A.2d at 101.

Petitioners also attack the adequacy of the Commission's analysis of the cost to PEPCO's customers of implementing TOD rates. We find that the Commission's cost analysis is adequate. As the Commission observed, PEPCO's only real cost of implementing TOD rates is the cost of TOD meters and their installation. These meters have already been installed, and consequently, the metering costs will be passed on to the customers whether or not TOD rates are implemented. 31 PUR4th at 226. The Commission further found that any other potential customer costs "are no deterrent to adoption of the TOD concept for PEPCO's large customers." 31 PUR4th at 258. The Commission acknowledged that exact predictions about load-shifting and reduction in energy consumption cannot be made and that, therefore, the precise nature and extent of the impact of TOD rates on

**23.** The testimony of Richard A. Galligan, for Hotel Association of Washington, D. C., appears at R. 3421–23. Witness Galligan observed: "[R]estructuring PEPCO's demand charge, which currently contains a Generation cost element, by now eliminating such charge, only to reinstate such a charge in the '. . . next few years . . .' represents rate instability at its worst." R. 3422.

PEPCO's customers cannot be measured.[24] The Commission, however, declined to accept petitioners' assertion that TOD rates will lead to "truly dramatic increases," 31 PUR4th at 261, and simply observed:

> It is undeniable that some customers will have to pay more for electricity when TOD rates are implemented than they do under current rates. But that is precisely the way it should be. These large commercial customers have not been paying the costs of serving them. It is also true that some customers may make capital expenditures to reduce their bills. But no customer is likely to make capital expenditures or incur other costs as a result of TOD rates unless the customer expects to save more in lower electric bills than it costs to install the necessary equipment. [31 PUR4th at 226].

Thus, the Commission essentially has taken the position that as long as PEPCO's customers are being confronted with the costs they are imposing on the system, these costs cannot be unreasonable or exorbitant;[25]

rather these costs are necessary to achieve the goals set by the Commission.[26]

■ We conclude that the Commission's TOD rate structure is supported by a sufficient cost-benefit analysis. There is substantial support on the record for the Commission's findings that TOD rates will promote rate equity and that there is potential that TOD rates will promote the conservation of energy and the maximization of efficiency in facility and resource use by electric utilities. Petitioners have not demonstrated that the consumer interest has been inadequately considered or that TOD rates will be exorbitant. Petitioners, therefore, have fallen short of demonstrating a "fatal flaw" with respect to this aspect of the Commission's decision.

V. *Rate Discrimination: Application of TOD Rates to Large Commercial Customers Only*

■ Petitioners contend that the TOD rate structure approved by the Commission is unjustly discriminatory in violation of D.C.Code 1973, §§ 43–301 and –902.[27] Peti-

---

24. Petitioner Board of Trade also argues that, although the Commission may have taken evidence on the impact that each of the parties' proposals would have on the customers' bills if adopted, the Commission did not have before it any evidence concerning the impact of the rate structure actually adopted in its Final Opinion which is not exactly like any of the rate structures presented by the parties. Petitioner's argument avoids the obvious point made by the Commission: the precise nature and extent of the impact of *any* TOD rate structure on PEPCO's customers cannot be measured, for, at this stage, it is impossible to determine how customers will respond to TOD rates. *See* notes 19 & 20 *supra.*

25. We reiterate that, in this case, we are dealing only with these TOD principles, and therefore, venture no opinion as to whether a marginal cost based, TOD rate structure might under some circumstances produce impermissible and "exorbitant" rates prohibited by § 43–301 of the D.C.Code.

26. Remaining consistent with this position, the Commission refused to build a cap into PEPCO's rate design to limit increases in customers' bills, but chose rather to confront PEPCO's customers with the costs they are imposing quickly and without softening the impact. 31 PUR4th at 261. The Commission stressed:

> The time has come to bring greater equity into PEPCO's rate structure for its large customers and to send proper price signals to them so that intelligent decisions regarding energy consumption can be made. We do not believe that these goals can be accomplished if we adopt features in the overall plan which tend to disguise the true costs of providing service during different periods of the day, month, and year. [31 PUR4th at 238–39.]

Should unexpected and "truly dramatic" increases occur, the Commission retains the power to review its TOD rate structure if it finds that such action is mandated by circumstances of public necessity. *See* D.C.Code 1973, § 43–411; *Atlantic Tel. Co. v. Pub. Serv. Comm'n,* D.C.App., 390 A.2d 439, 445 & n.8 (1978).

27. D.C.Code 1973, § 43–902 provides in pertinent part:

> If any public utility or any agent or officer thereof shall, directly or indirectly, by any device whatsoever, or otherwise, charge, demand, collect, or receive from any person, firm, or corporation a *greater or less compensation* for any service rendered or to be rendered by it in or affecting or relating to the conduct of a[n] . . . electric plant . . . that it charges, demands, collects, or receives from any other person, firm, or corporation other than one conducting a like business *for a like*

tioners make two basic arguments to support this contention. First, they argue essentially that in order to achieve the goals of a TOD pricing system all of PEPCO's customers should pay TOD rates. Anything short of requiring all of PEPCO's customers to pay TOD rates, they assert, is irrational and arbitrary and would result in the sending of improper price signals to large numbers of PEPCO's customers. These customers, then, implicitly would be encouraged to continue to consume electricity during peak periods and to undercut the goals of the TOD pricing system.[28] Secondly, petitioners argue that the selection of the specific TOD class, which is comprised of large, commercial customers who have experienced a monthly demand of 1000 kw or more during at least two months of the last full calendar year,[29] was arbitrary. We have examined petitioners' arguments and conclude they have no merit.

To address petitioners' arguments, we must first examine the meaning of the statutory requirement that rate designs and

specific rates be "reasonable, just, and non-discriminatory." D.C.Code 1973, § 43–301. In *Atlantic Telephone Co. v. Public Service Commission*, D.C.App., 390 A.2d 439, 444 (1978), this court observed that "[n]ot every variation in the rate charged for a particular service . . . supports a claim of unlawful discrimination" and that "the Commission must consider whether customers have paid different amounts for the same service under the same circumstances" to determine whether there has been unjust discrimination within the meaning of § 43–301. We stressed that "[s]o long as the classifications are reasonable, a difference in rates may exist between different classes of customers." *Id.* This court, in fact, specifically has endorsed the classification of customers based on the quantity of their demand. *See Apartment House Council v. Public Service Commission*, D.C.App., 332 A.2d 53, 57 (1975).[30] Therefore, if the Commission's selective imposition of TOD rates is supported by a reasonable basis in the record, its deci-

*and contemporaneous service*, such public utility shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be a misdemeanor and unlawful, and upon conviction thereof shall forfeit and pay to the District of Columbia not less than $100 nor more than $1,000 for each offense; and such agent or officer so offending shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not less than $50 nor more than $100 for each offense. [Emphasis added.]

28. Petitioner Board of Trade carries this argument one step further. Board of Trade argues that only the TOD customers will pay for PEPCO's increasing marginal costs and that, therefore, the TOD customers will subsidize non-TOD ratepayers. We note, however, that initially the Commission will give effect to the new TOD class of general service customers and establish the revenue requirement for this class and the other classes. It is only after the Commission establishes the class revenue requirements that the Commission will formulate the actual TOD and non-TOD rates to recover these class revenue requirements. R. 4381–82. See note 9 *supra*, for a general discussion of a utility's revenue requirement and rate design. There is nothing in the record presently before us to indicate the Commission will require the TOD class to bear a disproportionate and unreasonable share of PEPCO's total revenue requirement or of any future revenue increases.

29. At the time the Commission proceeding was initiated, approximately 210 customers fell into the TOD class. 31 PUR4th at 246. Since that time, the TOD class has continued to grow.

30. In *Apartment House Council v. Pub. Serv. Comm'n*, the Apartment House Council (AHC) challenged rates approved by the Commission that resulted in a lower rate of return for PEPCO from residential class customers than from general service (GS) customers (primarily commercial and industrial). AHC, whose members were GS customers, claimed that the differentials in rates of return amount classes of customers constituted unreasonable, unjust, and discriminatory rates. PEPCO explained the two primary reasons for the rate of return differentials: (1) the high usage and proportionately greater production costs relating to the GS class; and (2) the GS class' major contribution to customer peak demand due to air conditioners. This court rejected AHC's argument that the rate of return differentials were not supported by substantial evidence and constituted unjust discrimination. We noted that equal return from customer classes is not required and that any differences in rate of return need not be "specifically and quantitatively supported by customer class-cost considerations." *Id.* at 57.

sion must be affirmed. *Accord, New York State Council of Retail Merchants, Inc. v. Public Service Commission, supra* at 668–69, 384 N.E.2d at 1285, 412 N.Y.S.2d at 361–62.

We turn now specifically to petitioners' first argument—that TOD rates must be applied across-the-board in order to further the Commission's goals in a fair and rational manner. Initially we note that although the Commission chose to implement TOD rates for large commercial customers only, the Commission has indicated its intention to consider applying TOD rates to other classes of customers [31] in accordance with the PURPA mandate.[32] It may be true that an immediate, across-the-board implementation of TOD rates would further all of the Commission's goals in the most effective manner, but it does not follow that a selective implementation of TOD rates will preclude the Commission from achieving its goals or that there is no reasonable basis for distinguishing between PEPCO's large commercial customers and smaller commercial and residential customers. Therefore, we need not and do not now condition the reasonableness of the Commission's classification on the eventual across-the-board implementation of TOD rates.

Several factors persuaded the Commission, at least initially, to implement TOD rates for large commercial customers only. Perhaps most importantly the Commission noted the experimental nature of TOD rates and observed that "it is neither practical nor does it make much sense to test the merits of a new rate design for all classes of customers at the same time. 31 PUR4th at 246. The Commission also adopted PEPCO's rationale for initially and experimentally metering the class of customers which the Commission later defined as the TOD class. PEPCO's decision was governed by management's desire to conduct a valid "experiment" without incurring undue expenses and so PEPCO considered two factors: (1) the adequacy of the sample size; and (2) metering costs. *Id.* The Commission was particularly concerned with the relative expense of metering costs for different classes of customers: "For large commercial customers, TOD rates require metering costs which are infinitesimal compared to their benefits. But for residential customers, TOD metering costs would be relatively more expensive; consequently, the cost-benefit ratio would be more problematic." 31 PUR4th at 226. Along these lines, it is significant that, because PEPCO did the metering prior to the Commission's

31. The Commission stressed: "[N]o one should misread our decision here as prejudicing whether TOD rates should be extended to *residential* customers . . . . Before making any decision about residential customers the commission will conduct another proceeding which explores that issue." 31 PUR4th at 226–27 (emphasis in original). *See also* 31 PUR4th at 256–57. The Commission also noted that PEPCO "is presently formulating an experimental program for the collection and analysis of data as to the feasibility of application of TOD rates to large residential customers" and that "specific implementation of the standard with respect to all classes and customer groups other than large commercial must await completion and scrutiny of PEPCO's studies." Formal Case No. 715, Order No. 7135, at 93.

32. We note that PURPA contains time limitations which would seem to require the Commission to complete its consideration of the PURPA standards and to make its determination "[n]ot later than three years after November 9, 1978." 16 U.S.C. § 2622(b)(2). If the Commission does not comply with PURPA's

timetable, all PURPA requirements may be judicially enforced. PURPA provides in 16 U.S.C. § 2633(c)(1):

Any person (including the Secretary) may obtain review of any determination made under subchapter I or II of this chapter or under this subchapter with respect to any electric utility (other than a utility which is a Federal agency) in the appropriate State court if such person (or the Secretary) intervened or otherwise participated in the original proceeding or if State law otherwise permits such review. Any person (including the Secretary) may bring an action to enforce the requirements of this chapter in the appropriate State court, except that no such action may be brought in a State court with respect to a utility which is a Federal agency. Such review of action in a State court shall be pursuant to any applicable State procedures.

*See generally* Note, *Constitutionality and Effectiveness of the Electric Utility Provisions of the Public Utility Regulatory Policies Act of 1978, supra* at 800 & n.89.

decision to implement TOD rates for large commercial customers,[33] these costs to PEP-CO, ultimately passed to the consumer, already had been incurred. Therefore, a TOD ratemaking scheme would entail no further metering costs unless the Commission chose to proceed with an across-the-board metering program. The Commission's consideration of those factors should preclude us from interfering with its decision to implement TOD rates initially for large commercial customers only. Although PEPCO's customers will be subject to different ratemaking schemes and ultimately pay different rates for essentially the same service, PEPCO's different classes of customers are not similarly situated. Therefore, the classification and differing rates have a reasonable basis in the record.

▮ Petitioners' second argument—that the selection of a specific TOD class comprised of customers who have experienced a monthly demand of 1000 kw or more during at least two months of the last full calendar year was arbitrary—is likewise without merit. Naturally, any cut-off point involves some element of arbitrariness as does any classification, but the need to draw a line does not convert an otherwise reasonable classification into an arbitrary classification. *Accord, New York State Council of Retail Merchants v. Public Service Commission, supra* at 668–69, 384 N.E.2d at 1285, 412 N.Y.S.2d at 361–62 (approving a line of demarcation fixed at those customers whose peak demand exceeded 750 kw in any two of the preceding twelve months). More-

over, the Commission had made every effort to compensate for this unavoidable element of arbitrariness.[34] We, therefore, reject petitioners' contention that the TOD rate structure approved by the Commission is unjustly discriminatory in violation of D.C.Code 1973, §§ 43–301 and –902.

## VI. *The Exceptions Procedure and the Production and Transmission Charge Refinement*

▮ Petitioners' final argument is that the procedure by which the Commission adopted the minimum production and transmission charge after the issuance of their Proposed Opinion constituted a deprivation of petitioners' statutory [35] and due process rights; and that the Commission's decision to impose a minimum production and transmission charge is not supported by substantial evidence in the record. In order to address these issues, we must first review the Commission's Proposed Opinion and Final Opinion as they relate to the minimum production and transmission charge finally adopted.

The Commission's Proposed Opinion describes the methodology by which PEPCO is to meet its revenue requirement through four basic charges: an energy charge, a distribution charge, a production and transmission charge, and a customer charge. The Commission decided that the TOD energy charges and distribution charges should recover PEPCO's full marginal running costs during each of the rating periods established in the decision and that no ad-

**33.** Formal Case No. 680 had its beginnings in Order No. 5739, the Final Opinion issued by the Commission on November 12, 1975 in Formal Case No. 630. In Order No. 5739, the Commission ordered PEPCO to install TOD meters for its large commercial customers. No party filed a petition for review of this aspect of Order No. 5739.

**34.** In an attempt to eliminate a potential "migration" problem—customers moving in and out of the TOD class—the Commission established a restriction precluding a customer from being removed from the TOD class unless that customer's demand has not exceeded 900 kw in any month of the preceding calendar year. The Commission then observed:

> We do not know whether the 900–1000 kw interval provides a sufficient margin. But this is the kind of problem which can only be dealt with in a concrete setting after some experience has been gained from actual implementation. If problems do arise, PEPCO and its customers are free to bring them to our attention. [31 PUR4th at 247.]

**35.** Specifically, petitioner AOBA alleges that the Commission's procedures with respect to this matter violated D.C.Code 1973, §§ 43–410, –415, –416, –421, –422 and –702. These provisions relate to notice, hearing, and other requirements binding on the Commission.

justments should be made to these charges in order to meet the test-year revenue requirement. Recognizing that TOD rates may have to be adjusted downward to meet the test-year revenue requirement, the Commission rules that any adjustment should be made only to the production and transmission components of the demand charge.[36]

The Commission heard oral argument on the parties' exceptions to the Proposed Opinion. At oral argument, counsel for PEPCO advised the Commission that the company had uncovered a problem with the Commission's methodology. Counsel advised the Commission that strict adherence to the Commission's methodology could, under certain circumstances, result in the marginal energy charge and the distribution charge absorbing the entire revenue requirement. In that event, there would be no revenue left to be recovered through the production and transmission charge, despite

the fact that the Commission specifically decided that a portion of the revenue requirement should be recovered through the production and transmission charge. 31 PUR4th at 233.[37]

Following oral argument, interested parties held a conference to formulate a solution to the problem. Petitioner AOBA was present at the conference. Petitioner Board of Trade was notified of the scheduling of the conference, but chose not to attend. The signatory parties of the resulting Data Conference Report suggested that the Commission's methodology could be augmented by establishing a floor below which the generation and transmission charges would not be allowed to fall. The parties suggested that this floor be set at the Pennsylvania-New Jersey-Maryland (PJM) power pool's capacity deficiency charge.[38] The Commission adopted and incorporated this recommendation into its Final Opinion[39] without reopening the hear-

---

**36.** The Commission's rationale is set out in its Proposed Opinion:

> The commission is persuaded that, if an adjustment in any of the charges is required because of the revenue constraint, that adjustment should be made to the demand charge and not to the energy charge. There are several reasons for this. In the first place, as people's counsel witness Figley explained, the calculation of marginal energy costs is far more exact than the calculation of marginal demand costs. By adjusting the least exact charge, the commission reduces the chances of designing a rate which fails to send the proper price signal. Secondly, and perhaps more importantly, the ultimate effect of a reduction in kwh consumption will be felt immediately. If a customer reduces its energy consumption on-peak by 100 kwh and the marginal cost has been properly estimated, PEPCO will save exactly that marginal cost in fuel and related operating expenses. This effect contrasts with marginal demand costs when the ultimate effect of a saved KW of peak demand may not be experienced for years. [31 PUR4th at 232.]

**37.** PEPCO also suggested that unadjusted energy and distribution charges in future cases may even recover too much revenue, resulting in a negative production and transmission charge. Apparently, this problem could arise if PEPCO's marginal energy costs rise more quickly than the overall revenue requirement of the TOD class. *Final Opinion*, 31 PUR4th at 252.

**38.** As indicated in note 10 *supra*, PEPCO is a member of the PJM power pool. The PJM pool centrally dispatches its member utilities' generation facilities so that the most efficient mix of plants will be available to satisfy the requirements of the pool as a whole. 31 PUR4th at 231. If PEPCO needs to obtain additional generating capacity, it can purchase such capacity at the PJM deficiency charge. The Commission observed that, since this opportunity to purchase capacity is available to PEPCO, the PJM deficiency charge represents the marginal cost to PEPCO of an additional kw of generating capacity. *Final Opinion*, 31 PUR4th at 253.

**39.** The suggested refinement works in the following manner:

> *First*, if the commission adheres to its Order No. 7002 methodology, PEPCO shall compute its TOD rates as prescribed by that methodology.... *Second*, PEPCO shall ascertain whether the resulting TOD generation and transmission charge—aggregated over the peak months—is at least equal to the PJM pool's capacity deficiency charge. *Third*, if it is, PEPCO need make no further adjustment in its TOD rates. *Fourth*, if the unadjusted generation and transmission charge aggregates to less than the PJM pool's capacity deficiency charge, then PEPCO shall adjust all its TOD charges as follows:
> a. PEPCO shall increase the generation and transmission charge so that—aggregated over the peak months—it is equal to the PJM pool's actual capacity deficiency charge....

ing to take further evidence or to permit cross-examination. 31 PUR4th at 253.

Petitioners' procedural argument is that the Commission should not have considered the Data Conference Report or incorporated its refinement into the Commission's Final Opinion. Rather, petitioners argue, the Commission should have recognized that the problem raised by PEPCO during oral argument concerning the production and transmission charge necessitated a reopening of the record to permit further evidence to be taken subject to cross-examination. This argument is based on a narrow and inflexible view of the exceptions procedure which the Commission has adopted and utilized in ratemaking proceedings as well as on an inaccurate perception of the Commission's role in this proceeding.

Dissemination of a Proposed Opinion for critical review and the submission of exceptions is, as the Commission explains, not only permissible but necessary to aid the Commission with the identification of potential problems and the development of

refinement in methodology to avoid future problems. In the specific context of this case the Data Conference resulted in an extension of the exceptions process. Thus, the Commission properly could consider and adopt the Data Conference Report refinements without taking additional evidence, provided the refinements were supported by substantial evidence already in the record.[40]

In this case, as the Commission observed, the Data Conference Report, "did *not* present the Commission with any new evidence." [41] Formal Case No. 680, Order No. 7046, at 2; 31 PUR4th at 253. The Commission initially had determined that a production and transmission charge should recover a portion of the revenue requirement. 31 PUR4th at 233. Staff witness Bower recommended the PJM capacity deficiency charge as the appropriate charge for generating capacity because it approximates the cost of the peaking unit. Because the PJM capacity deficiency charge is the amount which PEPCO actually would be required to

b. Combined with the TOD energy and distribution charges, the adjusted generation and transmission charge will produce revenues in excess of PEPCO's revenue requirement for the TOD class. PEPCO shall reduce the TOD energy and distribution charges so as to eliminate revenues in excess of the revenue requirement. As between the energy and distribution components, the reduction in revenues shall be the same as the ratio between marginal energy and distribution costs. [31 PUR4th at 252.] [Emphasis in original.]

**40.** In an analogous federal context, the Supreme Court has observed that administrative agencies not only have the flexibility to consider "offers of settlement," but also have the responsibility to consider such offers on their merits in light of the evidence of record, even if the proposed settlement fails to receive the unanimous support of the parties. The Supreme Court has cited with approval the Fifth Circuit's analysis of the provision of the Federal Administrative Procedure Act, 5 U.S.C. § 554(c) (1976), which governs offers of settlement:

If a proposal enjoys unanimous support from all of the immediate parties, it could certainly be adopted as a settlement agreement if approved in the general interest of the public. But even if there is a lack of unanimity, it may be adopted as a resolution *on the merits*, if FPC makes an independent finding sup-

ported by "substantial evidence on the record as a whole" that the proposal will establish "just and reasonable" rates for the area. [*Placid Oil Co. v. FPC*, 483 F.2d 880, 893 (5th Cir. 1973) (emphasis in original), *aff'd sub. nom. and quoted in Mobil Oil Corp. v. FPC*, 417 U.S. 283, 313–14 [94 S.Ct. 2328, 2348–49, 41 L.Ed.2d 72] (1974).]

*See also Michigan Consol. Gas Co. v. FPC*, 108 U.S.App.D.C. 409, 429, 283 F.2d 204, 224, *cert. denied sub nom. Panhandle Eastern Pipe Line Co. v. Michigan Consol. Gas. Co.*, 364 U.S. 913, 81 S.Ct. 276, 5 L.Ed.2d 227 (1960).

**41.** *Compare Potomac Elec. Power Co. v. Pub. Serv. Comm'n*, D.C.App., 402 A.2d 14, *cert. denied*, 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979). In that case, the Commission granted Potomac Elec. Power Co. a rate increase based on 1974 test-year data. The Commission denied a request to use more recent data submitted in a last minute filing. We held that this was a reasonable exercise of the Commission's discretion and noted that, in a rate increase case, "wholly new data are furnished at the end of a case, procedural due process as well as basic considerations of fairness require an opportunity for all parties to examine the new data, to cross-examine the utility's witnesses regarding it and to offer such evidence in surrebuttal as necessary." *Id.* at 20.

pay for a unit of electricity in excess of its generating capacity, the Commission concluded that it reasonably represents the marginal cost to PEPCO of additional capacity.[42] The Commission made an independent assessment of the reasonableness of the suggested minimum charge and based its decision to adopt the refinement on substantial evidence in the record. We, therefore, find no procedural or substantive defect in the Commission's decision to adopt a minimum generation and transmission charge based upon the PJM capacity deficiency charge.

Recognizing the experimental nature of TOD rates and our circumscribed scope of review, we conclude that the Commission's adoption of the TOD ratemaking principles articulated in Orders 7002 and 7034 represents a reasonable step toward implementing a potentially effective TOD pricing system and that the Commission's decision finds substantial support in the record. Petitioners have failed to demonstrate that the Commission's decision contains a "fatal flaw." We therefore affirm the decision of the Commission.

*Affirmed.*

---

42. See Notes 10 & 38 *supra*, for a discussion of the relationship between PEPCO and the Pennsylvania-New Jersey-Maryland (PJM) power pool.